S & G EXCAVATING, INC.

v.

The UNITED STATES.

No. 137–85C.

United States Claims Court.

July 5, 1988.

James E. Sullivan, Terre Haute, Ind., for plaintiff.

Carol N. Park–Conroy, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

MARGOLIS, Judge.

Plaintiff, S & G Excavating, Inc. (S & G), seeks a refund of reclamation fees collected by the Department of the Interior's Office of Surface Mining (OSM) pursuant to the Surface Mining Control and Reclamation Act of 1977 (Surface Mining Act), 30 U.S.C. §§ 1201–1328. Plaintiff claims that it is exempt from the provisions of the Surface Mining Act and is therefore entitled to a refund of the $75,008.27 in reclamation fees it paid to OSM under the Act, plus interest. The defendant claims the plaintiff is not exempt from the Surface Mining Act and has filed a counterclaim for an additional $50,511.90 in fees, plus interest. Plaintiff appeals from the administrative determination that plaintiff is not entitled to an exemption. The parties have filed cross motions for summary judgment. After a careful review of the administrative record and after hearing oral argument, the plaintiff's motion for summary judgment is granted, and the defendant's cross motion for summary judgment is denied.

## FACTS

S & G Excavating is an Indiana corporation incorporated in 1961 for the purpose of conducting a general contracting business, including the mining and sale of sand and gravel. In 1977, S & G leased a parcel of land in Vigo County, Indiana, on which were located substantial quantities of sand and gravel. At this location, known as "Pit No. 1," S & G produced sand and gravel from 1977 to 1982. In addition to the sand and gravel, S & G also removed the topsoil and a five foot thick seam of coal underlying a limestone and shale layer near the bottom of Pit No. 1.

Production of coal from Pit No. 1 began in October 1977 after S & G had applied for and obtained a mining permit. Prior to the excavation of coal from Pit No. 1, S & G had never previously mined coal. Approximately one year after coal extraction be-

gan, Andrew Gilmore, an inspector from OSM, contacted S & G on December 19, 1978, and requested sales figures for coal and other minerals sold during 1978. Based on the sales figures provided, Inspector Gilmore determined that S & G's operation was covered by the Surface Mining Act, and OSM notified S & G that reclamation fees were due.[1] Inspector Gilmore's conclusion that the Surface Mining Act applied was based on a review of sales figures showing the tonnage of coal and the tonnage of minerals actually *sold* during the period January through December 1978. Based on this determination, S & G began paying the assessed reclamation fees. No fees were assessed for coal extracted from October through December 1977.

On January 2, 1979, K.C. Geier, another inspector from OSM, visited the mine site and concluded in his report:

> Tonnage of coal excavated and sold on site is less than 16⅔% of total tonnage including topsoil, sand, gravel and limestone excavated and sold. Will not need to comply with Federal Regulations because of this.

During inspections of Pit No. 1 on August 5, 1980 and October 10, 1980, Inspector Gilmore reviewed production figures for Pit No. 1 for 1979–1980, examined the stockpiles, and determined that S & G's coal production was in fact below the statutory threshold of 16⅔% of total mineral production. Inspector Gilmore based this conclusion not only on actual mineral sales, but also on sand, gravel, and topsoil that S & G had produced and stockpiled pending sale. At this time, Inspector Gilmore advised S & G that its operation fell within the exemption to the Surface Mining Act and that Pit No. 1 was therefore outside of OSM's jurisdiction.

On October 21, 1980, Michael Fansler, an OSM Fee Compliance Officer, conducted an on-site inspection of Pit No. 1, including an examination of S & G's books and records.

---

1. The Surface Mining Act provides for the assessment of a reclamation fee of $0.35 per ton of coal mined, unless the coal is mined incidentally with other minerals where the coal production does not exceed 16⅔% of the total mineral production.

On February 11, 1981, Fansler advised S & G that it would be entitled to a preliminary refund of $41,380 in reclamation fees already paid because those fees had been assessed on the mistaken assumption that the Surface Mining Act applied to S & G's Pit No. 1 operation.

On March 31, 1981, Inspector Gilmore conducted another stockpile survey as part of his ongoing site inspections. He analyzed tonnage data for an eleven month period, May 1, 1980 to March 27, 1981. Inspector Gilmore once again concluded that coal production from S & G's Pit No. 1 operation was below the statutory threshold. He then discontinued his on-site inspections. During this same period, S & G filed a request for a refund of fees paid between January 1978 and the second quarter of 1980.

In September 1981 and again in February 1982, Inspector Gilmore reviewed tonnage data for S & G, including data for the six months following March 27, 1981. In these reviews, Inspector Gilmore confirmed that S & G's Pit No. 1 continued to be exempt from the Surface Mining Act. The September 9, 1981 inspection report concluded that:

> According to figures supplied to this office, total production since 3–27–81 is 459,430 tons, of which coal is 30,030 tons. This percentage is 6.54 and therefore this operation does not come under OSM jurisdiction.

The February 9, 1982 inspection report likewise indicated that "[Pit No. 1] produced less than 16⅔% coal" and was therefore "removed from the inspectable unit list." Mineral production from Pit No. 1 ceased on March 31, 1982.

Following S & G's request for a refund, OSM conducted an extensive audit in 1982 of S & G's Pit No. 1 operation. This audit, conducted by OSM Auditor George Abrams, based its conclusion on *sales* of coal and other minerals instead of on actual mineral *production*. Abrams concluded that the ratio of S & G's coal sales to mineral sales exceeded the statutory

threshold, and therefore, the operations at Pit No. 1 were not entitled to an exemption from the reclamation fee provisions of the Surface Mining Act. As a result, OSM assessed S & G an additional $50,511.90 in reclamation fees for coal produced between October and December 1977 and from the third quarter of 1980 through the termination of coal production in 1982. S & G appealed this decision, but the Director of OSM, in a final decision based on the Abram's audit, affirmed the decision on June 8, 1982. S & G then filed suit in the United States District Court for the Southern District of Indiana on February 21, 1984 challenging the fee assessment and seeking to recover the monies already paid. The case was subsequently transferred to this court.

As a result of S & G's challenge, Abrams conducted a second audit of S & G's production in 1985, this time including all stockpiled materials except topsoil.[2] The estimates of the stockpiled minerals used in this audit were provided by the Chief of OSM's Division of Engineering Analysis. Abrams again concluded that S & G was not exempt from the Surface Mining Act.

Reconsideration of the June 1982 decision was never completed, however. As a result, on October 3, 1986, this court remanded the case to OSM to complete its reconsideration of S & G's claim for an exemption of Pit No. 1 from the coverage of the Surface Mining Act, 30 U.S.C. §§ 1232(a), 1291(28)(A). On April 1, 1987, the Director of OSM determined that S & G was not entitled to a refund and must pay all unpaid reclamation fee assessments plus interest.

## DISCUSSION

The Surface Mining Control and Reclamation Act of 1977 (Surface Mining Act) provides as follows:

> All operators of coal mining operations subject to the provisions of this chapter shall pay to the Secretary of the Interior ... a reclamation fee of 35 cents per ton

**2.** OSM guidelines published in 1984 indicate that OSM does not consider topsoil to constitute a "mineral" under the Surface Mining Act. *See* discussion *infra.*

of coal produced by surface coal mining. . . .

30 U.S.C. § 1232(a).

The Surface Mining Act defines "surface coal mining operations" as:

activities conducted on the surface of land in connection with a surface coal mine. . . . *Provided, however,* That such activities do not include the extraction of coal incidental to the extraction of other minerals where coal does not exceed 16⅔ per centum of the tonnage of minerals removed for purposes of commercial use or sale. . . .

30 U.S.C. § 1291(28)(A).

"Other minerals" is defined to include: clay, stone, sand, gravel, metalliferous and nonmetalliferous ores, and any other solid material or substances of commercial value excavated in solid form from natural deposits on or in the earth, exclusive of coal and those minerals which occur naturally in liquid or gaseous form.

30 U.S.C. § 1291(14).

In its cross motion for summary judgment, the defendant argues that the Surface Mining Act prescribes a two-part test that must be satisfied before an operator qualifies for the exemption under 30 U.S.C. § 1291(28)(A): first, the production of coal must be "incidental" to the extraction of other minerals; and, second, the production of coal must be less than 16⅔% of the total minerals produced for commercial sale or use. The defendant alleges that S & G has failed to meet either prong of this test and, as a result, is not eligible for the exemption.

S & G contends that the Surface Mining Act contemplates a one-part test and that coal mining is *per se* incidental when coal production is less than 16⅔% of total mineral production. Further, S & G contends that even if a two-prong test is applied, the extraction of coal was, in fact, "incidental" to the extraction of sand, gravel, and topsoil and that during the operation of Pit No. 1, production of coal remained below the statutory threshold of 16⅔%. S & G also alleges that the defendant's reliance on the 1982, 1985, and 1987 audits is erroneous, that in all of these audits the de-

fendant improperly excluded or discounted the amount of stockpiled minerals.

*A. Standard of Review*

■ The Administrative Procedure Act (APA) sets forth the applicable standard for judicial review of agency action. The APA provides:

The reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; . . .

5 U.S.C. § 706(2)(A); *see Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). In reviewing agency action, the scope of the inquiry permitted under this standard is limited to the administrative record. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). Section 706 of the APA requires the reviewing court to engage in a "thorough, probing, in-depth review" of the agency action, *Overton Park,* 401 U.S. at 415, 92 S.Ct. at 823, to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 824.

■ While the court's inquiry into the facts must be searching and careful, "[t]he court is not empowered to substitute its judgment for that of the agency." *Id.* At the same time, the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). An agency decision is arbitrary and capricious to the extent the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

### B. *Exemption under 30 U.S.C. § 1291(28)(A)*

The Surface Mining Act, enacted into law by the 95th Congress, dates back to the 92d Congress. Although Congress passed the Act twice before, once in the 93d Congress, S.425, 93d Cong., 1st Sess., 119 Cong.Rec. 33333–45 (1973), and again in the 94th Congress, H.R. 25, 94th Cong., 1st Sess., 121 Cong.Rec. 7069 (1975), each met with a presidential veto. Despite extended debate on these bills, there is very little legislative history concerning the exemption to the Surface Mining Act contained in 30 U.S.C. § 1291(28)(A). This section of the Surface Mining Act exempts surface mining operations in which the extraction of coal is "incidental to the extraction of other minerals where coal does not exceed 16⅔ per centum of the tonnage of minerals removed for purposes of commercial use or sale."

It is the defendant's position that this exemption sets forth a two-part test: the extraction of coal must be incidental to the extraction of other minerals; and, the coal tonnage removed cannot exceed 16⅔% of the total minerals removed for commercial use or sale. Plaintiff argues that if Congress had intended to create a two-pronged test, it would have added the word "and" in the statutory language.

■ In this case, the court finds it unnecessary to engage in an analysis of statutory semantic nuances. The statute can reasonably be interpreted in either fashion, and the legislative history does not indicate which test Congress sought to have applied. In such a situation, it is well settled that a reviewing court will accord great deference to an agency's interpretation of the statute it is charged with administering. *American President Lines, Ltd. v.*

*United States,* 821 F.2d 1571, 1577–78 (Fed.Cir.1987) (citing cases). As the Supreme Court has stated: "It is now commonplace that 'when faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.' " *EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980) (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). If an agency adopts an interpretation of its statute that has a reasonable basis in the law, absent cogent reasons for disturbing that interpretation, the agency's interpretation will be sustained even if there are alternative reasonable interpretations. *See Young v. Community Nutrition Institute,* 476 U.S. 974, 980–81, 106 S.Ct. 2360, 2364–65, 90 L.Ed.2d 959 (1986); *Unemployment Compensation Comm'n v. Aragon,* 329 U.S. 143, 153–54, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946); *American President Lines,* 821 F.2d at 1577.

■ Applying these tests, this court is unable to conclude that OSM's interpretation of the statute is unreasonable. In light of the absence of any pertinent legislative history on this point, the statute can reasonably be read in two fashions, and this court must uphold OSM's interpretation as long as it is reasonable. *See American President Lines,* 821 F.2d at 1577. Therefore, the two-part test will be used to determine whether OSM's refusal to exempt S & G from the Surface Mining Act was arbitrary, capricious, an abuse of discretion, or contrary to law.

#### 1. Statutory Threshold Requirement

The first test that must be satisfied to qualify for an exemption under 30 U.S.C. § 1291(28)(A) is that the total coal tonnage extracted must be less than 16⅔% of the total tonnage of minerals removed for commercial use or sale. This test would seem to be rather straightforward:

$$\text{Percent Coal} = \frac{\text{Coal Removed}}{\text{Coal Removed} + \text{Other Minerals Removed for Commercial Use or Sale}}$$

Both OSM and S & G attempted numerous computations to determine whether S & G satisfied this prong of the test. However, a number of differences in interpretation precluded easy resolution of this test.

### a. *Administrative Decision*

In its April 1, 1987 reconsideration decision, OSM again denied an exemption to S & G. OSM's Director concluded:

S & G has not demonstrated that coal represents 16⅔ percent or less of the total mineral production from Pit No. 1. Sales records are the only records that S & G maintained to show the production of coal and other minerals from Pit No. 1. [OSM] used these records to calculate the total percentages of coal and non-coal minerals produced. These calculations showed that S & G's coal production was well over 16⅔ percent of the overall mineral production.

S & G objected to [OSM's] reliance on these figures and noted that it had stockpiled minerals that were produced but not immediately sold. S & G claimed that tonnages for these stockpiled materials should be included in the determination of the overall percentage of coal production. Calculations based on these estimates would tend to show the percentage of coal to be less than 16⅔ percent of the total mineral production. However, [OSM] finds these stockpile tonnages unreliable since S & G cannot document each year's production and S & G improperly included topsoil as a mineral.... (citations omitted).

■ Based on 30 C.F.R. § 870.11(d), which exempts mines upon a showing that "coal does not exceed 16⅔ percent of the mineral tonnage removed for commercial use or sale in any twelve consecutive months," OSM contends that S & G must account for its mineral production on a twelve consecutive month basis. However, prior to June 30, 1982, the regulation did not require that mineral production be ac-

counted for on a twelve consecutive month basis. *See* 30 C.F.R. § 870.11(d) (1981). Plaintiff correctly notes that on June 30, 1982, this regulation was amended as an express exercise of the Secretary's authority to implement the statute, rather than as an interpretation of the statute, to include the twelve consecutive month requirement. *See* 47 Fed.Reg. 28594 (1982). This amendment was published three months after S & G ceased all mineral production at Pit No. 1. Therefore, the regulation in effect during the entirety of S & G's mineral production at Pit No. 1 did not contain any language regarding the period for the accounting of production.

Defendant argues that this regulation should be applied retroactively because the alternatives to a twelve month interval would be either a quarterly interval, which is unacceptable because it would produce extreme variations due to the short time frame, or to measure production over the "life of the mine." The defendant objects to the use of a "life of the mine" measure because OSM would not be able to determine whether a mine was exempt until production at the mine had ceased. While the defendant's concerns may have some merit, the court does not believe that the regulation as amended is entitled to retroactive application. *See Sam v. United States*, 230 Ct.Cl. 596, 606, 682 F.2d 925, 932 (1982), *cert. denied*, 459 U.S. 1146, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983); *United States v. Shelton Coal Corp.*, 647 F.Supp. 264, 265–67 (W.D.Va.1986), *aff'd*, 829 F.2d 1336 (4th Cir.1987). In this case, the administrative record indicates that during production at Pit No. 1, S & G kept records in accordance with the industry practice, which was to weigh minerals when sold, not when stockpiled. As a result, S & G did not have the twelve consecutive month production records available that OSM requested in 1982.[3] Notified in 1982 of the

---

**3.** However, during production at Pit No. 1, OSM had ample opportunity to confirm the production figures. During 1978–1982, OSM fee compliance officers and inspectors conducted frequent on-site inspections of coal and mineral

production at Pit No. 1. In every instance in which production was measured (as opposed to sales), these officials reported that their inspections revealed that S & G was producing *less*

twelve consecutive month requirement, S & G attempted to reconstruct its stockpiles on a production year basis.

OSM's solution to the absence of production figures for stockpiled materials was to disregard as unreliable S & G's reconstruction of its stockpiled production years. In essence, OSM's 1982 audit treated S & G's stockpiled minerals as if they had never been removed from the mine.

The distinction between accounting for the minerals when sold rather than when removed is critical due to the different market demands for the minerals. The administrative record indicates that because a ready market for coal existed, all of the coal produced from Pit No. 1 was readily sold as it was extracted. However, because the market for sand and gravel was intermittent, S & G accumulated large stockpiles of these other minerals. These stockpiles of minerals removed for commercial use or sale were not included in the 1982 audit. Therefore, the results of that audit were skewed, greatly overstating the percentage of coal produced in relation to the percentage of other minerals produced. The express statutory language of Surface Mining Act specifically provides that the exemption is based on minerals *removed* for commercial use or sale, not on minerals actually *sold*.

This court also disagrees with the defendant that a production year method is the only reliable means of computation available. While requiring mines to produce production figures on a twelve consecutive month basis is perfectly permissible, to require such accounting after production has stopped is unfair to the plaintiff.

than 16⅔ percent coal and, therefore, that S & G was exempt from the Surface Mining Act.

4. Another alternative available to OSM was to rely on the on-site findings of its inspectors and fee compliance officers. For reasons that OSM has not made clear, OSM has refused to recognize the findings of its own agents.

5. S & G estimated yearly production by averaging the total stockpiled minerals over the period of operation. OSM, on the other hand, determined the year in which each stockpile was initiated and then allocated the total tonnage of each stockpile to that year. The problem with

In the absence of reliable yearly production figures, the only reasonable alternative was to use a "life of the mine" approach.[4] For the very fact that production at Pit No. 1 had ceased, the "life of the mine" measure could be applied to this case. In fact, OSM's 1987 review report, prepared by OSM Mining Engineer Ihni Hong, properly notes that in the absence of meaningful yearly production figures, a "life of the mine" analysis should be used. The report used a "life of the mine" approach because, as the report stated, "[i]t is rather realistic to establish a production data base for the period from the beginning through the ending of coal production as one unit time interval and to compute the coal production ratio to all mineral production for that entire coal producing time period."

Because OSM's 1987 decision relied solely on sales data instead of production data, the 1987 decision does not comport with the statutory requirement that the percentage of coal be based on "the tonnage of minerals removed for purposes of commercial use or sale." The Director of OSM had available several OSM audits of the stockpiled minerals as well as numerous on-site reports from OSM inspectors. The Director also had available S & G's estimates of production on a yearly basis that could have been used to determine whether S & G qualified for an exemption.[5] If the Director concluded that these estimates were unreliable, then a "life of the mine" approach could have been used to accurately measure coal production as a percentage of total mineral production.[6]

OSM's approach is that the record indicates that the stockpiles took many years to accumulate. As a result, OSM's estimated yearly production tends to overstate mineral production in the early years of production when many of the stockpiles were initiated.

6. In fact, exactly two months after OSM issued its reconsideration decision, which refused to use the life of the mine approach, OSM published proposed rules on June 1, 1987 that provided: "The 16⅔ percentage test applies to the total coal and other mineral production achieved over the life of mining at each individual excavation." 52 Fed.Reg. 20549 (1987).

During the period of mineral production at Pit No. 1, the Surface Mining Act and OSM regulations required measurement of minerals *removed* for commercial use or sale; the statute and regulations did not require that production be accounted for on a twelve consecutive month basis to determine whether the exemption applied. Therefore, OSM's failure to include S & G's stockpiled mineral production in its 1987 reconsideration report was arbitrary, capricious, an abuse of discretion, and not in accordance with the law. Accordingly, OSM's 1987 reconsideration decision cannot be upheld.

### b. *Proper Measurement of Minerals Removed*

▌ Because the methodology employed in OSM's 1987 reconsideration decision was not in accordance with the law, it is necessary to include the tonnage of stockpiled minerals to determine whether S & G's coal production from Pit No. 1 exceeded 16⅔% of the total minerals removed from Pit No. 1 for commercial use or sale. The evidence in the administrative record overwhelmingly supports the conclusion that S & G's Pit No. 1 coal production was less than 16⅔% of total mineral production.

Appended to OSM's 1987 reconsideration decision is a 1987 review report prepared by OSM Mining Engineer Ihni Hong. It does not appear that OSM's Director relied on this report when making his decision to deny S & G an exemption. First, the report uses a life of the mine approach, an approach the Director refused to apply in this case. Further, the report included all of the stockpiled minerals—stockpiles that the Director refused to consider. The report also classified topsoil as an "other mineral," while the Director stated that OSM did not consider topsoil as an "other mineral." Moreover, the report concluded that, based on the inclusion of the stockpiled minerals, coal production constituted more than 16⅔% of total mineral production, whereas the Director stated in his decision that calculations that included stockpiled minerals "would tend to show the percentage of coal to be less than 16⅔ percent of the total mineral production."

While the review report properly considered the stockpiled minerals using the "life of the mine" approach, the report has a number of measurement errors that overestimate the percentage of coal production. For example, the report states that S & G sold a total of 373,604 tons of coal from 1977 through the first quarter of 1982. However, that total includes coal from Pits Nos. 1, 2, and 3. The administrative record clearly indicates that the coal sold from Pit No. 1, the only mine involved in OSM's determination, totals only 354,279 tons.

To calculate the production of other minerals, the review report adds the total of all minerals sold and the volume of all the stockpiles. The report calculates that 640,681 tons of other minerals were sold from 1977 through March 31, 1982, the date production ceased. The report calculated the stockpile volume based on an aerial photograph taken on July 29, 1982. However, the report fails to consider the other minerals that were sold over the four month period between March 31, 1982 and July 29, 1982. Sales records indicate that S & G sold an additional 43,508 tons of other minerals from Pit No. 1 during that intervening period for a total of 684,189 tons.

The review report also calculated stockpiled minerals as totaling 1,043,272 tons. The report subtracted stockpiles X and Y from inclusion because "[b]eing a mixture of many different materials, the material is not marketable as an item product." Yet, plaintiff argues that stockpiles X and Y were indeed marketable and point out that at the time Mr. Hong was completing the report, a good portion of these stockpiles had already been sold.

Due to the errors contained in the review report, combined with the evident lack of reliance upon this report by OSM's Director, this court does not believe that the report constitutes a credible source for determining the tonnage of the stockpiled minerals. Fortunately, OSM's Division of Engineering Analysis conducted an earlier detailed audit of the stockpiled minerals. This audit concluded that S & G had total

mineral stockpiles of 1,147,435.83 tons including topsoil.

On May 7, 1984, three months after S & G filed suit to challenge OSM's refusal to grant it an exemption, and more than two years after production at Pit No. 1 ceased, OSM, in the process of soliciting comments on certain regulations, published in the Federal Register "guidelines" that provided:

> Until final regulations are promulgated on the subject, it is OSM's position that the term 'other minerals' does not include topsoil and fill dirt. OSM, however, has requested comments on this subject and will carefully review and consider all comments concerning these materials.

49 Fed.Reg. 19338 (1984). OSM has yet to publish a regulation on this subject. Such a guideline is not entitled to the same deference as a regulation, which can be set aside only if the Secretary exceeded his statutory authority or if the regulation is arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law. *Batterton v. Francis*, 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977).

In reviewing the statute and the administrative record, the court cannot help but conclude that in the absence of a regulation on this subject topsoil should be included as an "other mineral." First, at no time while S & G operated Pit No. 1, did OSM have a policy that topsoil did not constitute an "other mineral." In fact, all of OSM's inspectors and fee compliance officers who inspected Pit No. 1 included topsoil as an other mineral. Also, OSM's 1982 audit included topsoil as an "other mineral." Moreover, even following the publication of this guideline, OSM was not consistent in excluding topsoil as an other mineral as evidenced in OSM's 1987 review report, which included topsoil as an "other mineral."

While defendant now argues that topsoil should not be included as an "other mineral," this court, noting the broad definition of "other mineral" in the statute, does not believe this interpretation to be reasonable in light of the plain meaning of the statute and OSM's own inconsistency in applying the guideline. Applying the statutory language, topsoil is clearly a "solid material ... of commercial value excavated in solid form from natural deposits on or in the earth...." 30 U.S.C. § 1291(14). Therefore, to exclude topsoil from the definition of "other minerals" contradicts the express statutory language. Regardless, even if OSM can justify the exclusion of topsoil from the definition of "other minerals," OSM published this guideline more than two years after production *ceased* at Pit No. 1. The regulations in effect during the period in which Pit No. 1 operated, and to the present, do not exclude topsoil as an "other mineral." It is evident through the plain meaning of the statute, and through OSM's own inclusion of topsoil as an "other mineral," that topsoil should be included in the calculations of total minerals removed for commercial use or sale.[7]

The formula for calculating the percentage of coal removed thus emerges as follows:

$$\text{Percent Coal} = \frac{\text{Coal Produced}}{\text{Coal Sales} + \text{Other Mineral Sales} + \text{Stockpiled Minerals}}$$

$$\text{Percent Coal} = \frac{354,279}{354,279 + 684,189 + 1,147,435} = \frac{354,279}{2,185,904} = 16.207\%$$

OSM also determined that in-house use of mined minerals should not be included in the tonnage figures for total minerals produced. This exclusion was erroneous as the statute provides for the inclusion of minerals removed for commercial *use* or sale. Therefore, the 24,674 tons of gravel that were used in-house for building roads,

---

**7.** The fact that such a guideline was passed several months after S & G brought suit further casts into doubt as to whether the guideline should be applied in this case.

parking lots, and stemming, should be included in the computations as minerals removed from Pit No. 1 for commercial use.[8] Adding the 24,674 tons of in-house gravel to the total mineral production reduces the percentage of coal produced to 16.026%.

Therefore, the court concludes that the percentage of coal produced at Pit No. 1 over the life of the mine constituted no more than 16.026% of the total minerals mined at Pit No. 1 for commercial use or sale. This result indicates that plaintiff has satisfied the first prong of the two-part test.

### 2. "Incidental"

Plaintiff alleges that every time that S & G lodged a protest or filed a complaint, OSM responded within a month or two by publishing a guideline, interpretation, or rule that effectively served to defeat S & G's claim. The defendant denies that any relationship existed between S & G's claims and OSM's promulgation of new policy or regulations. Nevertheless, the result of OSM's failure to establish a coherent and consistent policy engendered an abundance of contradictory interpretations of the statute.

Likewise, OSM has been unable to cogently define the term "incidental." The legislative history of the Surface Mining Act indicates that the exemption contained in 30 U.S.C. § 1291(28)(A) is designed to exclude operations "where coal is found but is not the mineral being sought." S.Rep. No. 128, 95th Cong., 1st Sess. 98 (1977); S.Rep. No. 28, 94th Cong., 1st Sess. 225 (1975); S.Rep. No. 402, 93d Cong., 1st Sess. 75 (1973).[9] Such language indicates that it is the operator's purpose in mining the site that is the controlling determinant in whether the coal production is incidental.

In *United States v. Beaird Coal Co.*, No. CV–84–V–0850–J, slip op. at 8 (N.D.Ala. Mar. 10, 1986), *rev'd on other grounds*, 825 F.2d 1471 (11th Cir.1987), the court interpreted the legislative history of the Surface Mining Act as comprehending a "primary intention" test to determine whether coal production was "incidental." Likewise, in administrative hearings before the Department of the Interior, the administrative judges applied a multi-pronged balancing test to determine whether the coal extraction was incidental. *McNabb Coal Co. v. Office of Surface Mining*, No. TU 6–34–R, slip op. at 7–9 (July 23, 1986), *rev'd*, IBLA 86–1559 (Mar. 15, 1988); *Cordova Clay Co. v. Office of Surface Mining*, No. NX 5–3–R, slip op. at 4 (Jan. 2, 1986).

Instead of focusing on the location of the coal deposits, this test considers a number of factors to determine, in accordance with the legislative history, which minerals are primarily being sought. If it is determined that the primary purpose of the mine is to extract coal, the recovery of coal is not incidental to the recovery of the other minerals no matter what percentage of coal is removed. However, if the mine operator's primary purpose is to mine sand and gravel, then the recovery of coal is incidental to the sand and gravel operation.

In *McNabb Coal Co.*, IBLA 86–1559, the administrative judge found that the coal extraction was not incidental to the recovery of other materials based on the following factors: the mining of coal was essential to the economic viability of the mine; the coal was the deepest strata mined for commercial use or sale; the acreage of the shallower deposits extracted for commer-

---

**8.** However, because there is a factual issue concerning whether the glacial till materials used to cover old Gob Piles at the Tri–K Mine (101,352 tons) were removed from Pit No. 1 for commercial use or sale, the court will not determine whether these minerals should also be included in the computations. The court will also not determine whether stockpile Z (21,506.805 tons) and another small stockpile north of the main stockpile (21,684.5 tons) should be included in the computations because there is a question of fact as to whether these stockpiles were generated during the operation of Pit No. 1. Omission

of these factors tends to raise the relative percentage of coal produced.

**9.** Other than that comment, there is no legislative history to indicate how Congress intended the phrase "incidental to the extraction of other minerals" to be applied. The Senate Report from the 93d Congress did explain that "[o]pen pit mines and surface mining for materials other than coal are not subject to this bill." S.Rep. No. 402, 93d Cong., 1st Sess. 40.

cial use or sale was less than 50% of the acreage of the coal deposit extracted; the acreage of the mineral deposit immediately above the coal seam extracted was less than 5% of the acreage of coal extracted; and the decision to mine the deposit immediately above the coal was based on the decision to mine the coal. In light of the above, the judge concluded that McNabb Coal Co. had failed to sustain the burden of establishing an exemption.

In the case at hand, the defendant urges the court that OSM properly interpreted "incidental" to mean that coal had to be mined in order to mine the other minerals. The defendant argues that because the coal seam was the lowest geological strata of material in Pit No. 1, separated from the gravel by a seven to twelve foot layer of limestone and shale, its removal could not possibly be incidental to the removal of the sand and gravel. Defendant concedes that absent the layer of limestone and shale, the removal of coal might be considered to be incidental. Nevertheless, OSM's 1987 reconsideration decision uses a combination of the locational test and the primary purpose test to determine whether the coal removal was incidental. The decision concludes that the removal of coal was not incidental to the extraction of the sand and gravel because "[i]n addition to the physical location of the coal [beneath the sand and gravel], the history of mineral extraction in Pit No. 1 clearly demonstrates that after 1977, coal was the primary mineral being sought."

■ Such a conclusion is questionable in light of OSM's finding that coal was not discovered at Pit No. 1 until after a good deal of the sand and gravel had been excavated. In this case, the court is satisfied that S & G's primary purpose in excavating Pit No. 1 was to recover sand and gravel. Again, coal was not even discovered at Pit No. 1 until excavation was well under way. Further, S & G had never before sold coal prior to the fall of 1977 when coal was discovered at Pit No. 1. Pit No. 1 was opened as a sand and gravel operation, and it continued to produce large quantities of sand and gravel through 1982.

A three to five foot layer of limestone and a two to eight foot layer of shale and slate were spoiled to gain access to the coal. As the sand and gravel were removed and either sold or stockpiled, S & G would then extract and sell the coal.

While OSM's locational analysis does provide an easy to apply bright line test, the legislative history of the statute and previous administrative interpretations strongly suggest that a primary purpose test, while perhaps more difficult to apply because it involves an analysis of the totality of the circumstances, is the proper test to apply. The court believes that the location of the coal seam alone, without more, is insufficient to conclude that the coal extraction was not incidental to the removal of other minerals. Because S & G's primary purpose at Pit No. 1 was to remove sand and gravel for commercial use or sale, S & G's recovery of coal from Pit No. 1 was therefore incidental to the recovery of sand and gravel. Accordingly, the second prong of the two-part test is also satisfied.

## CONCLUSION

■ For the reasons stated above, the court concludes that the Director of OSM's 1987 reconsideration decision denying plaintiff an exemption was arbitrary and capricious, an abuse of discretion, and not in accordance with the law. The court further concludes that plaintiff S & G's operations at its Pit No. 1 satisfy both parts of the test for an exemption under 30 U.S.C. § 1232(a): the percentage of coal recovered was less than 16⅔% of the total minerals removed from the mine for commercial use or sale; and, the removal of coal was incidental to the removal of the sand and gravel. Therefore, the plaintiff's motion for summary judgment is granted, and the defendant's motion for summary judgment is denied. The Clerk will dismiss the defendant's counterclaim and will enter judgment for the plaintiff in the amount of $75,008.27. Defendant will bear the costs.