**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**BEAIRD COAL COMPANY, INC., and**
**Cordova Clay Company, Inc.,**
**Defendants-Appellees.**

**No. 86–7402.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 6, 1987.

Frank W. Donaldson, U.S. Atty., Richard E. O'Neal, Asst. U.S. Atty., Birmingham, Ala., Robert S. More, Sp. Asst. U.S. Atty., U.S. Dept. of Interior, Knoxville, Tenn., David I.C. Thomson, Environmental Enforcement Section, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Phillip A. Laird, Laird & Wiley, P.C., Jasper, Ala., for defendants-appellees.

Before TJOFLAT and ANDERSON, Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

The United States brought this action in the United States District Court for the Northern District of Alabama against the defendants Beaird Coal Company (Beaird Coal) and Cordova Clay Company (Cordova Clay) seeking reclamation fees on coal extracted by the defendants' mining operations in Walker County, Alabama during the first quarter of 1979 through the second quarter of 1982. Following a bench trial, the district court entered judgment against Beaird Coal for reclamation fees, interest and penalties.[1] The court also held that Cordova Clay owed no reclamation fees since the proportion of coal to other minerals mined did not exceed the statutory exemption. Finding the court's factual determination inconsistent with its previous interpretation of the relevant statute, we reverse.

The Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. 1201 *et seq.* (SMCRA), requires the Secretary of the Interior to establish an "Abandoned Mine Reclamation Fund," 30 U.S.C. § 1231 (Fund), for the restoration of lands ravaged by past coal mining activity. The Fund is financed by a reclamation fee assessed on each ton of coal produced by current surface or underground coal mining operations. 30 U.S.C. § 1232(a). The statutory definition of "surface coal mining operations" contained in 30 U.S.C. § 1291(28) provides a de minimus exception for coal extracted incidentally to the mining of other minerals. That section provides in pertinent part:

provided, however, that such activities do not include the extraction of coal incidental to the extraction of other minerals where coal does not exceed 16⅔rds per centum of the tonnage of minerals removed for purposes of commercial use or sale....

Therefore, a mining operation may avoid the payment of any reclamation fee by proving that the coal produced is less than or equal to 16⅔rds per cent of the total mineral tonnage extracted. Once the tonnage of coal exceeds that percentage, however, the reclamation fee required by § 1232(a) is due for every ton of coal removed.

The controversy in the district court revolved around the applicability of this ex-

---

1. The judgment against Beaird Coal is not challenged on appeal.

emption to the coal mining operations conducted by Cordova Clay. The facts presented at the trial were largely without dispute. Gail Beaird, president of both defendant corporations, testified to the long history of his family's involvement in the Alabama clay business. Beaird joined the family company in 1959 and Cordova Clay has since grown into one of the most prominent suppliers of clay and shale in the southeast.

Beaird also testified that the terrain in Alabama where he mines clay and shale is interlaced with seams of coal. This coal is extracted along with the other minerals and sold on the spot market. In 1975, Beaird decided to incorporate his operations separately because of the high labor costs associated with coal mining. Beaird Coal employed union workers to mine coal while Cordova Clay's non-union workers extracted clay. In 1980, Beaird dissolved Beaird Coal due to unprofitability and Cordova Clay continued the mining of coal, clay, and shale.

During the time period covered by this litigation, Cordova Clay conducted mining activities at two main sites in Walker County. The Argo pit to the east of Mulberry Fork of the Warrior River provided the source of all coal extracted by the company. Clay and shale were mined at Argo and also at the Riceton pit on the west side of the river, some three miles distant. The clay mined at Argo differs in its physical properties from the clay extracted from the Riceton pit. Argo clay is more suitable for face brick while Riceton clay, which has a lower sand content, is used in the manufacture of refractory brick. Beaird stated that many of his customers require clay from either one side of the river or the other. Therefore, Cordova Clay could not meet its buyers' demands without clay from both mineral sites.

Before the trial, the parties stipulated as to the tonnage of coal mined by Cordova Clay at the Argo site during the calendar quarters covered by this litigation. It was further agreed that the tonnage of clay and shale mined at Argo and Riceton corresponded to that contained in the defendants' answer to the government interrogatories. Apparently, the parties selected this set of figures because it divided the tonnage of clay and shale produced according to the origin of the minerals at either Argo or Riceton. Whether or not the clay and shale from the west side of the river could be aggregated with the Argo minerals for purposes of computing the exemption was a major dispute at trial.

Despite the stipulation, the district court permitted the defendants to introduce different production figures through the testimony of Beaird and the government's auditor, Jessie Ray Davis. Davis testified about two audit reports, introduced into evidence, prepared by him from the records of Cordova Clay. Defendants' Exhibit 2 provides a breakdown of the clay and shale shipped to each of Cordova Clay's individual customers during the relevant quarters. Exhibit 4 compares the tonnages of coal, clay and shale on which Cordova Clay paid mineral royalties during that time period. Neither document indicates the source of the minerals.

Following the hearing, the district court issued a well reasoned order resolving several issues of first impression concerning the interpretation of the 16⅔rds exemption. Most important, the court expressly held that Cordova Clay could not aggregate the clay and shale produced at Riceton where no coal was extracted, with the clay and shale taken from the coal producing Argo pit. In the absence of relevant precedent or illuminative legislative history, the court relied on common sense in reaching this conclusion. The court noted that the single operation method urged by the defendants could result in anomalous applications of the reclamation fee statute:

> Mr. Beaird's approach in an extreme case could lead to a conclusion that a strip mine from which nothing but coal is mined is exempt because it is conducted in coordination with another mine several miles distant where a different mineral is extracted.

Therefore, the court held that "all of the pits to the east of the river ... constituted a single operation, but that within the meaning of the exemption the Riceton pit on the other side of the river constituted a separate operation."

The court found that Cordova Clay extracted 73,770.86 tons of coal during the pertinent calendar quarters as stipulated.[2] With respect to the amount of clay and shale produced, however, the court noted a "troublesome inconsistency" in the stipulated tonnages and therefore credited the auditor's figures introduced at trial. Without stating the total clay and shale tonnage or otherwise evidencing the relevant calculations, the district court held that Cordova Clay met the 16⅔rds per cent exemption. Thus, the defendant owed no reclamation fee on the coal extracted.

On appeal, the government argues that the ruling of the district court directed to the liability of Cordova Clay is fatally inconsistent. Since the clay and shale extracted at Riceton could not be aggregated with the Argo minerals in computing the exemption, the government contends that the district court committed clear error in relying on the audit reports since neither distinguished the minerals according to their source. Cordova Clay concedes that if the minerals from the two pits may not be combined as a matter of law, the court's factual finding that the company met the exemption based on the mineral production at Argo is erroneous.

■ Although the defendants did not file a cross-appeal, we must give consideration to whether, as a matter of statutory interpretation, the district court erred in refusing to aggregate the mineral output from both sites for purposes of the exemption. *See Greenwood Utilities Commission v. Hodel,* 764 F.2d 1459, 1465 (11th Cir.1985) (Court of Appeals may affirm district court for any reason supported by law despite lack of cross-appeal). As the district court noted, there is a complete dearth of case law, agency regulation, or legislative history which might provide a key to construing the somewhat cryptic language of the 16⅔rds per cent exemption.[3] In the absence of any evidence of congressional intent to the contrary, we endorse the trial court's logically sound mine-by-mine approach as the best means of effectuating the broad remedial purposes of SMCRA.

■ By affirming this interpretation of the statute, we are forced to conclude that the court based its calculations on incorrect figures. After a painstaking examination of the record, it is clear that the trial judge relied upon the audit figures contained in Defendant's Exhibit 2, a breakdown of the total tonnage of clay and shale shipped to the customers of Cordova Clay during the significant time period. We base this conclusion in large part upon a footnote in the court's order stating that the audit figures utilized by the court correspond to the figures relied upon by the defendant at the trial except for the last two quarters which were misread by the defendants. The record indicates that the auditor and defendants' counsel did indeed total the incorrect column of figures for the last two relevant calendar quarters when discussing Exhibit 2 at the trial.

The record indicates that the figures contained in Exhibit 2 relating to the clay and shale shipped to Cordova Clay's customers must necessarily have included clay and shale extracted at Riceton. A representa-

---

2. The parties did not stipulate as to the tonnage of coal extracted from Argo during the fourth quarter of 1981. The district court credited the defendant's figures for this time period.

3. Cordova Clay urges that we apply the rationale of two-acre exemption from the requirements of SMCRA provided in 30 U.S.C. § 1278(2) (1986). The regulation promulgated pursuant to that statute exempts commercial coal extraction operations where the "surface coal mining and reclamation operation, together with any related operations, has or will have an affected area of two acres or less." 30 C.F.R. § 700.11(b) (1986). Mining operations are deemed related if drainage from both flows into the same watershed within five aerial miles of either operation or if the operations are under common ownership or control. While these sweeping regulatory definitions serve to narrow the two-acre exemption, engrafting these precepts onto the 16⅔rds per cent exemption would have the opposite effect. We decline to extend the 16⅔rds per cent exemption so far.

tive of General Shale, one of the defendant's largest consumers listed on the audit report, testified at the trial that the clay extracted from the Argo pits did not meet the needs of his company. Davis, the government auditor who prepared the report, stated that he relied upon the defendant's mineral distribution ledger in determining the tons of clay and shale shipped to each of Cordova Clay's customers. Several times during the hearing, Davis claimed that he did not consider whether the minerals reflected in the ledger had been extracted from different sites.[4] This evidence mandates a determination that the district court erroneously relied upon figures which included the minerals produced at Riceton despite an earlier interpretation of the exemption forbidding aggregation of the output of the two mines.

In light of Cordova Clay's candid admission that the company cannot meet the statutory exemption without including the minerals produced at Riceton, a remand in this case for a correct calculation of the clay and shale produced at the Argo mine would constitute a mere intellectual exercise. In the interests of judicial economy, we reverse the factual finding of the district court that Cordova Clay is exempt from reclamation fees on the coal extracted by surface mining and render judgment for the government in the amount of $25,-819.80 plus applicable pre-judgment interest and late payment penalties.[5]

REVERSED and RENDERED.

---

4. The district court may have been inadvertently misled by Davis' response on cross-examination to the following question:

  Q. So if in order to fill a clay and shale order to Bickerstaff Clay or to General Shale, it was necessary for Mr. Beaird to extract clay and shale from a lease hold where coal was also extracted and yet it was also necessary for them to go to another site where there was not coal, you considered for in your purposes only the extraction of the site where the coal was located?

  A. Yes, sir.

Although Davis responded affirmatively, the auditor's other responses indicate that he misunderstood the question. Davis asserts repeatedly that he did not consider whether the figures in the mineral distribution ledger came from a single or multiple sites. Viewing the record as a whole, we are left with "a definite and firm conviction that a mistake has been committed." *Lincoln v. Board of Regents of University System of Georgia,* 697 F.2d 928 (11th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983).

5. This figure is the product of the 73,770.86 tons of coal produced by Cordova Clay at the Argo site during the relevant period times the 35–cent reclamation fee assessed on each ton of coal extracted by strip mining in accordance with 30 U.S.C. § 1232(a).