**HORIZON COAL CORPORATION, Plaintiff–Appellee,**

v.

**UNITED STATES of America, Defendant–Appellant,**

**Jerry Kohl d/b/a Kohl Industries, Third–Party Defendant–Appellee.**

**No. 93–3948.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 30, 1994.

Decided Oct. 27, 1994.*

---

\* This decision was originally issued as an "unpublished decision" filed on October 27, 1994.

J. Douglas Drushal (argued and briefed), Steven J. Shrock (briefed), Critchfield, Critchfield & Johnston, Wooster, OH, for Horizon Coal Corp.

Jacques B. Gelin (argued and briefed), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, James L. Bickett, Office of the U.S. Atty., Akron, OH, for U.S.

Leonidas E. Plakas, David L. Dingwell, Elizabeth Ann Raies (briefed), Tzangas, Plakas & Mannos, Canton, OH, for Jerry Kohl.

Before: GUY and BATCHELDER, Circuit Judges; and McKEAGUE, District Judge.**

PER CURIAM.

A coal mine operator initiated this action seeking reimbursement of reclamation fees paid to the government. The district court granted the operator's motion for summary judgment and ordered the government to refund the fees with interest. The government appeals, arguing, *inter alia,* that the district court erred by (1) exercising jurisdiction over this matter; (2) holding that shale removed from the mine in question was "removed for purposes of commercial use" within the meaning of 30 U.S.C. § 1291(28)(A); and (3) awarding interest to the operator. For the following reasons, we affirm in part and reverse in part.

### I.

### A.

The Surface Mining Control and Reclamation Act of 1977 (SMCRA or "Act") "was designed to 'establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations....'" *Southern Ohio Coal Co. v. Office of Surface Mining, Reclamation & Enforcement,* 20 F.3d 1418, 1421 (6th Cir. 1994) (quoting 30 U.S.C. § 1202(a)), *cert. denied,* —— U.S. ——, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994). To facilitate the rehabilitation of land that has been mined and left without adequate reclamation, Congress established the "Abandoned Mine Reclamation Fund," which is administered by the Secretary of the Interior. *See* 30 U.S.C. § 1231(a); *see also id.* § 1231(c)(1) ("Moneys

---

** Honorable David W. McKeague, United States District Court for the Western District of Michigan, sitting by designation.

in the fund may be used for ... reclamation and restoration of land and water resources adversely affected by past coal mining[.]").

Title 30 U.S.C. § 1232(a) provides:

All operators of coal mining operations subject to the provisions of this chapter shall pay to the Secretary of the Interior, for deposit in the fund, a reclamation fee of 35 cents per ton of coal produced by surface coal mining and 15 cents per ton of coal produced by underground mining or 10 per centum of the value of the coal at the mine, as determined by the Secretary, whichever is less....

*See also* 30 C.F.R. § 870.12. The Act defines "operator" as "any person, partnership, or corporation engaged in coal mining who removes or intends to remove more than two hundred and fifty tons of coal from the earth by coal mining within twelve consecutive calendar months in any one location[.]" 30 U.S.C. § 1291(13). Pursuant to 30 U.S.C. § 1232(e), the government may bring a civil action against coal mine operators that do not "properly or promptly" pay their reclamation fees.

As the Eleventh Circuit has explained, however,

[t]he statutory definition of "surface coal mining operations" contained in 30 U.S.C. § 1291(28) provides a de minimis exception [commonly referred to as "the one-sixth requirement"] for coal extracted incidentally to the mining of other minerals. That section provides in pertinent part:

provided, however, that such activities do not include the extraction of coal incidental to the extraction of other minerals where coal does not exceed 16 2/3[ ] per centum of the tonnage of minerals removed for purposes of commercial use or sale....

Therefore, a mining operation may avoid the payment of any reclamation fee by proving that the coal produced is less than or equal to 16 2/3[ ] per cent of the total mineral tonnage extracted. Once the tonnage of coal exceeds that percentage, however, the reclamation fee required by

§ 1232(a) is due for every ton of coal removed.

*United States v. Beaird Coal Co.,* 825 F.2d 1471, 1472 (11th Cir.1987), *cert. denied,* 484 U.S. 1009, 108 S.Ct. 706, 98 L.Ed.2d 656 (1988); *see also* 30 C.F.R. § 870.11.

### B.

The Black Hawk Mine, located in Stark County, Ohio, rests on two adjoining parcels of land that, when combined, span 750 acres. Jerry Kohl purchased the larger of the parcels (approximately 400 acres) in 1977. On August 20, 1980, Kohl entered into a lease agreement with the owner of the other parcel, Philip Lattavo. This agreement allowed Kohl to mine Lattavo's property for various minerals, including clay, shale, limestone, and coal. Kohl obtained an industrial minerals permit (IM–0750) from the Ohio Department of Natural Resources (ODNR).

A week after he had struck this deal with Lattavo, Kohl entered into another agreement, this time with Horizon Coal Corporation (Horizon).[1] Under the agreement between Horizon and Kohl, Horizon was given the right to mine coal at the Black Hawk Mine; Kohl, on the other hand, retained the right to mine all other minerals. Section 3(e) of the mining agreement provided that "Kohl would be responsible for compliance with 'the tonnage requirements of the permit ... or for converting to strip mining permit if required by the regulatory agency.'" Section 5 of the agreement added that "Horizon will pay all taxes and fees for its machinery and operations." Kohl subsequently submitted quarterly reports to ODNR reflecting the amounts of each mineral mined. Although Kohl sold much of what he had mined to various consumers, he kept much of the extracted shale—a move that apparently was motivated by a desire to improve the property. Kohl stockpiled the shale and used it as fill material for reclamation of the areas affected by surface mining operations.

More precisely, Kohl mined 1,237,143 tons of shale between 1983 and 1985. He sold, however, only 40,000 to 60,000 tons of this total. Whether the shale extracted by Kohl

1. Horizon has since merged with Holmes Limestone Company.

can be counted toward the total "tonnage of minerals removed for purposes of commercial use," 30 U.S.C. § 1291(28)(A), so as to enable Horizon and/or Kohl to satisfy the one-sixth requirement is a matter the parties dispute. As the government observes, if this question is answered in the affirmative, then the one-sixth requirement is met, which would preclude the government from collecting reclamation fees. If, however, the shale figures are not factored into the calculus, then the percentage of coal (vis-a-vis all other minerals extracted) rises to 37.95 percent for August 1982 through August 1983, 31.91 percent for August 1983 through August 1984, and 13.64 percent for August 1984 through August 1985.

Horizon ceased its mining operations at Black Hawk Mine in 1985. By that time, a separate corporation, Land Planning Associates, Inc. (Land Planning), had been formed to obtain the necessary permits for the construction of a sanitary landfill at the site. In 1986, Kohl and Lattavo, both of whom held shares in Land Planning, contracted with Green Basin Coals (Green Basin) for the sale of their respective parcels of land. Green Basin also purchased Land Planning. The following year, Green Basin sold its interests in the parcels and in Land Planning to Envirosure Management Corporation (Envirosure). Throughout these transactions Kohl maintained the right to mine the property pursuant to IM–0750; in fact, he continued to do so until December 1989, when he sold his mining rights to Waste Management of Ohio, Inc., a successor in interest to Envirosure.

In 1990, the Office of Surface Mining and Reclamation of the Department of the Interior (OSM) conducted a reclamation fee compliance audit of Horizon's mining operations for the period between the second quarter of 1983 through the first quarter of 1990. This was not the first time that a Black Hawk Mine operator had come under such scrutiny. In 1988 and again in 1989, ODNR had conducted a show cause hearing to determine whether Kohl was in compliance with the one-sixth requirement. The ODNR ultimately concluded that Kohl had not violated the one-sixth requirement and therefore did not require Kohl to obtain a coal mining permit. Notwithstanding this earlier conclusion, OSM found that Horizon had failed to report 165,200.12 tons of coal mined. On the basis of its finding, OSM assessed reclamation fees against Horizon in the amount of $57,820.04, covering the period from the second quarter of 1983 through the first quarter of 1985.

Horizon then sought administrative review of OSM's audit and fee assessment. In April 1991, OSM denied Horizon relief and found the company liable for the amount of the assessment plus over $36,000 in interest. After satisfying its liability in full ($97,324.23), Horizon initiated the instant action against the United States in federal district court, seeking a refund of its payment. As an alternative theory of recovery, Horizon also sought a judgment for the same amount against Kohl, who, it was urged, had violated his mining agreement with Horizon by failing to ensure that operations at the Black Hawk Mine were conducted in accordance with the one-sixth requirement.

The government responded by moving to dismiss or to change venue to the United States Claims Court. In this regard, the government argued that the district court did not have jurisdiction to consider suits involving the refund of reclamation fees. All parties then filed motions for summary judgment. After denying the government's motion to dismiss in October 1992, the district court granted Horizon's summary judgment motion in April 1993. The court reasoned that the State of Ohio has concurrent jurisdiction over the enforcement of SMCRA and that the state's prior determination regarding Horizon's compliance with the one-sixth requirement collaterally estopped the United States from collecting the reclamation fees in dispute. The court also noted that, in any event, Horizon would prevail on the merits because the shale that Kohl did not sell was "used at the site for commercial improvements in preparation for sale of the property as a sanitary landfill." As such, the shale, the court ruled, was mined for "commercial use or sale" within the meaning of 30 U.S.C. § 1291(28)(A). In a third ruling of significance to this appeal, the court held that Horizon was entitled to interest on the

amount the government had wrongfully collected. This appeal followed.

## II.

### A.

■ In its first assignment of error, the government reasserts its contention—advanced in its motion to dismiss or change venue below—that the district court was without jurisdiction to consider this action for a refund of reclamation fees. In this regard, the government challenges the district court's reliance on 28 U.S.C. § 1346(a)(1), as a basis for jurisdiction. This section provides:

> (a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:
>
> (1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws[.]

28 U.S.C. § 1346(a)(1).

At the heart of this issue is the meaning of the term "internal-revenue tax." According to the government, this term encompasses only those taxes imposed under the Internal Revenue Code, set forth in Title 26 of the United States Code. As such, it is urged, the jurisdictional provision of 28 U.S.C. § 1491(a)(1),[2] not that of § 1346(a)(1), governs the instant controversy. Section 1491(a)(1), the government contends, provides that refund actions like the present one are properly pursued in the federal claims court.

The government arrives at this conclusion by reading § 1346(a)(1) and 26 U.S.C. § 7422(a) together. Section 7422(a) states:

> (a) **No suit prior to filing claim for refund.**—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

26 U.S.C. § 7422(a). The government argues that the exhaustion of remedies requirement set forth in this section applies with equal force to § 1346(a)(1); that is, before a district court can assert jurisdiction over an action "for the recovery of any internal-revenue tax," the aggrieved party must submit a claim for a refund to the Secretary of the Treasury. As the government points out, however, it is the Secretary of the Interior, and not his or her counterpart at Treasury, who administers the SMCRA. To require an appeal to the Secretary of the Treasury is nonsensical, for he or she does not assess the reclamation fee in the first instance; in the government's words, "it would be irrational to expect plaintiff to make a demand on the Secretary of the Treasury in an effort to recover a tax levied by the Secretary of the Interior."

We have a broader view of "internal-revenue tax," as that term is used in § 1346(a)(1), and, accordingly, we reject the government's jurisdictional argument. We read the term as referring not to the Internal Revenue Code, but to revenue generated within the boundaries of the United States, as opposed to "external" revenue, which is derived from foreign sources through means such as import and customs duties.[3] Far from disputing this point, the government, in its brief to this court, actually concedes the historical validity of this internal-external dichotomy:

2. This provision states in part:
    The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or im-

plied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

3. The parties agree that reclamation fees are a species of "excise" taxes.

"The term 'internal revenue' appears to have been used historically to distinguish revenues from internal sources by way of taxes as contrasted with revenues from customs and foreign sources."

■ Equally unavailing is the government's claim that the exhaustion of remedies requirement of § 7422(a) applies to disputes in which § 1346(a)(1) provides the basis for district court jurisdiction. To be sure, it would be absurd to require coal mine operators like Horizon to seek a refund of a reclamation fee from the Secretary of the Treasury, but this absurdity arises only if the phrase "any internal revenue tax" contained in § 7422(a) is construed to include non-Title 26 taxes. Such a construction cannot be sustained. In our estimation, the dictates of § 7422(a) apply only to taxes imposed pursuant to Title 26.[4] After all, § 7422(a) does fall within the Internal Revenue Code. Moreover, to require a party seeking a refund of a Title 26 tax to appeal to the official charged with administering the Code, the Secretary of the Treasury, does not result in the type of anomaly discussed above.[5]

**B.**

Having determined that the district court properly exercised jurisdiction over Horizon's refund action, we next address the court's decision to accord preclusive effect to the ODNR's determination regarding Kohl's satisfaction of the one-sixth requirement. The government asserts that the doctrine of collateral estoppel is inapposite in this context because the federal government has exclusive authority over reclamation fee assessments. The government further asserts that, even if, as the district court held, it has only concurrent jurisdiction over these matters, collateral estoppel still would not bar the relitigation of Horizon's and/or Kohl's compliance with the one-sixth requirement since the government was not a party or in privity with a party to the prior state administrative proceeding. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). Because we agree that collateral estoppel is inapposite here, we do not consider the parties' status in the prior state administrative proceeding.

■ As the District of Columbia Circuit has explained:

[The Office of Surface Mining, Reclamation and Enforcement of the Department of the Interior ("OSM")] administers and enforces the [SMCRA]. 30 U.S.C. § 1211(c). A state, by developing a SMCRA-implementation plan approved by the Secretary, may assume jurisdiction over non-federal surface coal mining operations within its borders. 30 U.S.C. § 1253. Indeed, Congress anticipated that primary responsibility for the regulation of surface mining would "rest with the States." 30 U.S.C. § 1201(f). A federally-designed program governs in states that have not put in place an acceptable implementation plan of their own. 30 U.S.C. §§ 1254(a), (b), 1271(b).

*Save Our Cumberland Mountains, Inc. v. Lujan,* 963 F.2d 1541, 1544 (D.C.Cir.1992) (footnote omitted), *cert. denied,* —— U.S.

---

4. Horizon suggests §§ 7422(a) and 1346(a)(1) also may be harmonized by interpreting the former to require a plaintiff to file a refund claim with the appropriate government official, if not the Secretary of the Treasury. Horizon advances this argument notwithstanding the fact that § 1346(a)(1), does not, in its own terms, require a party to first seek administrative review. Horizon notes that it did seek a refund from the Secretary of the Interior in the instant case. Because we conclude that § 7422(a)'s exhaustion of remedies requirement applies only to Title 26 taxes, however, we need not pass on the validity of Horizon's argument.

5. We also are mindful of two important policy concerns, both of which militate in favor of the result we reach here. First, a finding that the United States Claims Court has exclusive juris-

diction over operator reimbursement actions would work a hardship against operators by requiring them to litigate their claims in Washington, D.C., rather than in the appropriate district court. *See Holmes Limestone Co. v. Andrus,* 655 F.2d 732, 740–41 (6th Cir.1981) (Merritt, J., concurring) (absent express statutory language foreclosing judicial review, ambiguous language should not be construed to foreclose such review considering resultant hardship upon litigants), *cert. denied,* 456 U.S. 995, 102 S.Ct. 2280, 72 L.Ed.2d 1292 (1982). In addition, we note that tax refund actions are among the most common of actions against the government. To preclude district court jurisdiction in these instances might have the undesirable, residual effect of unduly overburdening the claims court.

——, 113 S.Ct. 1257, 122 L.Ed.2d 655 (1993); *see also Southern Ohio Coal Co.*, 20 F.3d at 1427 ("[T]he SMCRA ... sets up a system of 'cooperative federalism,' in which states may choose to be primarily responsible for running federally-approved programs.").

■ Despite its status as one of the many states that administers its own federally-approved regulatory program, the State of Ohio's responsibility over "non-federal surface coal mining operations within its borders" is not "primary" in all instances. One qualification on the state's authority is set forth in 30 U.S.C. § 1235(d), which states in pertinent part:

If the Secretary determines that a State has developed and submitted a program for reclamation of abandoned mines and has the ability and necessary State legislation to implement the provisions of this subchapter, *sections 1232 and 1240 of this title excepted,* the Secretary shall approve such State program and shall grant to the State exclusive responsibility and authority to implement the provisions of the approved program[.]

(Emphasis added.)

The government notes that 30 U.S.C. § 1232, one of the two sections excepted by section 1235(d), governs reclamation fees. The district court discussed the relationship between §§ 1235 and 1232 in the following manner:

Although these sections provide that states with approved programs do not have exclusive jurisdiction over certain matters, the sections do not provide that exclusive jurisdiction, therefore, resides in the United States. Rather, the non-exclusivity references in Sections 1235 and 1253 merely refer to the fact that either the relevant state agency *or* the OSM may enforce the provisions regarding, for example, reclamation fees.

Although the United States was free to institute enforcement proceedings, it did not do so *prior to* the same proceedings being instituted by the State of Ohio. When the State of Ohio made its determination, under the authority of its approved state program, that the Black Hawk mining operation under permit IM–0750 met

the 1/6 requirement and that Kohl (and by extension Horizon) owed no reclamation fees, it settled the question as to the calendar quarters at issue in the instant lawsuit.

We read §§ 1235 and 1232 differently. We agree with the government's view that the federal government has *ultimate* authority over issues relating to reclamation fees. In reaching this conclusion, we do not intend to suggest that state agencies may not, for their own purposes, resolve factual issues that would be relevant to the federal government's assessment of reclamation fees. Indeed, this is exactly what happened in this case; the ODNR apparently considered the issue of Kohl's compliance with the one-sixth requirement for the limited purpose of determining whether IM–0750 would have to be converted to a coal mining permit. Making these types of factual determinations is part of a state's ongoing effort to administer its federally-approved program. Section 1235, however, does not allow operators to use favorable factual findings, procured through state administrative proceedings, to avoid the assessment of reclamation fees.

■ Collateral estoppel is even more inappropriate in this case because the ODNR and the federal government were not required to rely on the same criteria when they made the determinations at issue. For example, in its licensing proceeding, the ODNR was required by regulation to take into account, among other factors, the estimated future production of coal and other minerals from the Black Hawk Mine, the market for minerals other than coal, and Kohl's ability to service that market. *See* Ohio Admin. Code § 1501:14–2–02(B) (1991). By contrast, the government, for purposes of calculating reclamation fees, was required only to determine whether coal production at Black Hawk Mine exceeded 16 2/3 percent in any 12–month period. Thus, the federal government's analysis, unlike that of the ODNR, is exclusively backward-looking. As such, it is conceivable that, even with the same raw data, the ODNR and the federal government could have reached opposite conclusions with respect to whether Horizon and Kohl complied with the one-sixth requirement. To collaterally estop the government under

these circumstances would make little sense because the predicate factual issues upon which the ultimate legal conclusion depends (*i.e.*, compliance with the one-sixth requirement) are not identical from one proceeding to the next.

### C.

■ As an alternative ground for granting Horizon's motion for summary judgment, the district court ruled that Horizon would prevail on the merits in any event. The court found that Horizon qualified for the exception set forth in 30 U.S.C. § 1291(28)(A) and therefore could not be assessed reclamation fees. The government challenges this ruling, arguing that coal extracted from the Black Hawk Mine during the relevant periods constituted more than 16 2/3 percent "of the total tonnage of minerals *removed for purposes of commercial use or sale.*" 30 U.S.C. § 1291(28)(A) (emphasis added).

The parties agree that the resolution of this issue hinges on whether the shale mined by Kohl was "removed for purposes of commercial use or sale." If the shale mined by Kohl was removed for such purposes, then the government may not assess reclamation fees against Horizon or Kohl because the percentage of extracted coal (in relation to the other minerals extracted) will not have exceeded the 16 2/3 percent threshold. If the shale was not removed for commercial purposes, however, then reclamation fees would be in order.[6] Horizon and Kohl argue a commercial use, noting that the shale was used for the purpose of improving the property's value as a sanitary landfill. This, they contend, is a "commercial use" within the meaning of §· 1291(28)(A). For its part, the

government submits that Kohl mined the shale not for its mineral value but to use as fill material. In its words, "the excavation and movement of the shale is more accurately described as landscaping to prepare the site for construction, rather than the 'extraction of minerals.' "

The district court rejected the government's characterization of Kohl's use of the shale, reasoning:

> It is apparent . . . that from the onset Kohl's purpose was to improve the property's resale value by preparing it for use as a sanitary landfill. Kohl simply made *commercial use* of his own products for the improvements rather than buying products from a third party. Kohl clearly saw this as a money-making venture. Horizon's mining operation was strictly intended to remove the coal so that the remaining minerals could be used to reclaim the property and to prepare it for landfill use.

(Footnote omitted.)

■ We agree with the district court's conclusion. Congress's choice of the broad and general term "commercial use" (as distinguished from "commercial sale") implies that an operator need not sell extracted minerals to be entitled to the "incidental exemption." Nor does the phrase "commercial use" suggest that the operator must attempt to put those minerals to a commercial use that generates an immediate return or that reflects the value of those minerals *as* minerals.[7] Here, Kohl stockpiled and used the shale to reclaim the land in the aftermath of surface mining operations—a process that enabled him to prepare the land for its ulti-

---

6. The government suggests that 30 U.S.C. § 1291(28)(A) establishes a two-pronged test under which a party laying claim to a reclamation fee exemption must establish: (1) that the production of coal was "incidental" to the extraction of other minerals; and (2) that the percentage of coal mined did not exceed 16 2/3 percent of the total amount of mineral mined for commercial sale or use. *See S & G Excavating, Inc. v. United States*, 15 Cl.Ct. 157, 162 (1988). Horizon, on the other hand, argues that a court need only address the second prong of the government's test under § 1291(28)(A) to determine the applicability of the exemption; if coal production falls below the 16 2/3 percent limitation, it is, by

definition, "incidental" as that term is employed in § 1291(28)(A). *See Beaird Coal Co.*, 825 F.2d at 1472. We do not take this opportunity to resolve this dispute because, under either analysis, the result here would be the same.

7. Here, for instance, the shale extracted by Kohl was important to Kohl's effort to convert his property into a landfill because it could serve as landfill. The shale's value had little to do with its inherent properties that would distinguish it from any other mineral that could be used as landfill material.

mate transformation into a sanitary landfill. We hold that this constitutes a "commercial use" as that term is used by § 1291(28)(A). Accordingly, we affirm this aspect of the district court's decision.

### D.

Finally, the government takes issue with the district court's award of interest on Horizon's reclamation fees. The court based its award not on grounds advanced by Horizon but on a theory it devised *sua sponte.* As the court explained:

This case comes under the fifth amendment "takings" clause which prohibits the taking of private property for public use without just compensation.

The constitution itself requires the government to make Horizon Coal completely whole in this instance where the government improperly coerced Horizon Coal, under the threat of loss of its mining permit, to pay reclamation fees that Horizon Coal did not owe. On September 20, 1991, Horizon Coal paid the fees under protest and thereafter unsuccessfully pursued administrative remedies for a refund. In the meantime, Horizon Coal lost the use of over $97,000.00 of its money, while the United States was gaining interest on that same money.

Absent the requirement of interest in a case such as this, the government would have no incentive to make certain that it is collecting only those fees to which it is entitled. Nor would there be any incentive to speed the process of administrative review of claims of wrongfully assessed fees. The longer the government has the money, the better it is for the government. Action of this type is confiscatory in nature and, under the fifth amendment, entirely unsatisfactory.

In our estimation, the district court did not mean to imply that a "takings" has occurred anytime the government wrongfully recovers fees. Instead, the court found that a takings issue arises where, as here, the government improperly brings to bear its coercive power to secure a payment to which it is not entitled. Because we do not agree that the government acted coercively in this instance,

we do not pass on the validity of the district court's novel theory.

■ There are, however, other means of justifying an award of interest against the government. In this regard, the Supreme Court has instructed that "[a]part from constitutional requirements, in the absence of specific provision by contract or statute, or 'express consent ... by Congress,' interest does not run on a claim against the United States." *United States v. Louisiana,* 446 U.S. 253, 264–65, 100 S.Ct. 1618, 1626, 64 L.Ed.2d 196 (1980). Here, Horizon contends that it is due interest pursuant to 28 U.S.C. § 2411, which states in relevant part:

In any judgment of any court rendered (whether against the United States, a collector or deputy collector of internal revenue, a former collector or deputy collector, or the personal representative in case of death) for any overpayment in respect of any internal-revenue tax, interest shall be allowed at the overpayment rate established under section 6621 of the Internal Revenue Code of 1986 upon the amount of the overpayment, from the date of the payment or collection thereof to a date preceding the date of the refund check by not more than thirty days, such date to be determined by the Commissioner of Internal Revenue. The Commissioner is authorized to tender by check payment of any such judgment, with interest as herein provided....

Horizon's reliance on this provision is unavailing. Although § 2411 does refer broadly to "any internal-revenue tax," it requires that the Commissioner of Internal Revenue take action to effect the interest payment. Given this, § 2411 is most plausibly interpreted as governing interest payments on internal-revenue taxes imposed pursuant to the Internal Revenue Code.

■ The SMCRA does not contain a section requiring the payment of interest on reimbursed reclamation fees. Conceding this, Horizon claims that even if it is not entitled to recover interest on its reclamation fees it nevertheless is entitled under 30 U.S.C. § 1268(c) to interest on that portion of Horizon's refund representing civil penal-

ties. Horizon's claim is misguided, however, for the penalties at issue were assessed pursuant to 31 U.S.C. § 3717, not § 1268(c).

Because there is no constitutional, contractual, or statutory basis for an award of interest under the circumstances of this case, we reverse the district court on this issue.

**AFFIRMED in part and REVERSED in part.**