FILED
United States Court of Appeals
Tenth Circuit

March 9, 2011

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

WYODAK RESOURCES
DEVELOPMENT CORPORATION, a
Delaware corporation,

        Plaintiff–Appellant,

v.

UNITED STATES OF AMERICA,

        Defendant–Appellee.

No. 09-8097

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:07-CV-00301-WFD)**

Walter Frederick Eggers, Holland & Hart LLP, Cheyenne, Wyoming (Andrew Abbott
Irvine, Holland & Hart LLP, Jackson, Wyoming, with him on the briefs), for the
Plaintiff-Appellant.

Michael Thomas Gray, (Ignacia S. Moreno, Assistant Attorney General with him on the
briefs), United States Department of Justice, Environment & Natural Resources
Division,Washington, D.C., for the Defendant-Appellee.

Before **LUCERO**, **GORSUCH**, Circuit Judges, and **ARGUELLO**,[*] District Judge.

---

     [*] The Honorable Christine M. Arguello, United States District Judge for the
District of Colorado, sitting by designation.

**LUCERO**, Circuit Judge.

---

Wyodak Resources Development Corporation ("Wyodak") sued the United States in federal district court, seeking a refund of coal reclamation fees it allegedly overpaid under the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. §§ 1201-1328. The district court concluded that 28 U.S.C. § 1346(a)(1) provided a basis for federal jurisdiction and a waiver of sovereign immunity because the reclamation fee is an "internal-revenue tax." See id. However, the court denied relief on the merits and entered summary judgment in favor of the United States. We do not reach the merits of Wyodak's appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we conclude the district court did not possess jurisdiction. Because the reclamation fee is not an "internal-revenue tax" within the meaning of 28 U.S.C. § 1346(a)(1), Wyodak's claims may be filed only in the Court of Federal Claims under 28 U.S.C. § 1491.

**I**

Wyodak operates the Wyodak Mine, a large surface coal mine in the Powder River Basin of Wyoming. As a surface mine operator, Wyodak is subject to SMCRA. To further its goal of restoring mined land, SMCRA created the Abandoned Mine Reclamation Fund ("the Fund"), which exists on the books of the United States Treasury, but is administered by the Secretary of the Interior. 30 U.S.C. § 1231. SMCRA authorizes the Secretary of the Interior to assess reclamation fees on each ton of "coal produced" in the United States to finance the Fund. See id. § 1232. These reclamation

- 2 -

fees are collected by the Secretary of the Interior, id., specifically, by the Office of Surface Mining Reclamation and Enforcement ("OSM"), see 30 C.F.R. §§ 870.1-19. During the time period at issue in this case, OSM used a two-tiered reclamation fee structure: ten cents per ton for lignite coal, and thirty-five cents per ton for all other grades. See Surface Mining Control & Reclamation Act of 1977, Pub. L. 95-87, tit. IV, § 402(a), 91 Stat. 445, 457.

Between January 1, 1980, and December 31, 2005, Wyodak extracted more than 82 million tons of coal from the Wyodak Mine. It reported all of this coal as non-lignite and paid the higher reclamation fee of thirty-five cents per ton. In early 2005, Wyodak retained a consulting chemist to determine whether any of the coal at the Wyodak Mine was lignite. Samples taken from the ground showed that between 9.5% and 12.3% of the coal sampled in situ was lignite. In the first two quarters of 2006, Wyodak reported to OSM that it had extracted more than 2.2 million tons of coal and asserted that 282,988.42 tons of that total was lignite based on the chemist's studies. In addition, Wyodak claimed that it had overpaid reclamation fees from 1980 to 2005 because some of the coal produced was lignite.

OSM audited Wyodak's 2006 reports and concluded that Wyodak had underpaid. OSM took the position that SMCRA regulations require the reclamation fee to be calculated "at the time of the initial bona fide sale, transfer of ownership, or use by the operator," see 30 C.F.R. § 870.12(b), and not while coal remains in the ground. Because any lignite coal mined by Wyodak is comingled with non-lignite coal prior to sale, OSM

concluded Wyodak did not qualify for the lower reclamation fee. On the same basis, OSM refused Wyodak's retroactive refund claim for the years 1980 to 2005. Both decisions were upheld by an OSM Audit Appeals Officer.

Wyodak then sued the United States in federal district court, seeking a refund of $2,245,477.14 it allegedly overpaid in reclamation fees, and a declaratory judgment with respect to future fees. Both parties moved for summary judgment. The district court rejected the United States' argument that the court lacked subject-matter jurisdiction, but granted the government's motion on the merits.

On appeal, Wyodak contends the district court erred in its merits determination. The government renews its argument that the district court lacked jurisdiction. We do not reach the merits because we agree with the government's jurisdictional position.

**II**

**A**

Most suits for money damages against the United States proceed under the Tucker Act, 28 U.S.C. § 1491, which provides a limited waiver of the United States' sovereign immunity and grants "jurisdiction [to] the Court of Federal Claims for claims against the United States founded upon the Constitution, Acts of Congress, executive regulations, or contracts and seeking amounts greater than $10,000." Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d 1290, 1295 (10th Cir. 2009) (quotation omitted). Although we have occasionally called the Court of Federal Claims' jurisdiction over such claims "exclusive," e.g., id. (quotation omitted), its jurisdiction is only

exclusive over claims which no other federal court has the authority to hear. If there is an independent source of subject-matter jurisdiction over a claim against the United States, and some waiver of sovereign immunity other than the Tucker Act, a plaintiff is free to proceed in district court. "[T]he jurisdiction of the Court of [Federal] Claims is not exclusive; rather, there is rarely any statute available that waives sovereign immunity for suits in the district court, other than the Tucker Act with its $10,000 limit." C.H. Sanders Co. v. BHAP Hous. Dev. Fund Co., 903 F.2d 114, 119 (2d Cir. 1990) (quotation and emphasis omitted) superseded by statute on other grounds, as stated in United Am. Inc. v. N.B.C. – U.S.A. Hous., Inc. Twenty Seven, 400 F. Supp. 2d 59, 64 (D.D.C. 2005).

Wyodak invokes one of those rare statutes that both waives sovereign immunity and grants subject-matter jurisdiction to the district courts, 28 U.S.C. § 1346(a)(1). That statute waives the United States' sovereign immunity from suit, United States v. Williams, 514 U.S. 527, 530 (1995), and gives the Court of Federal Claims and the district courts concurrent jurisdiction over:

> Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws . . . .

28 U.S.C. § 1346(a)(1).

One short phrase in section 1346, "internal-revenue tax," establishes the jurisdictional battle lines in this case. Wyodak argues that the SMCRA reclamation fee is an "internal-revenue tax" because it is collected on internal, rather than external, revenue.

- 5 -

The United States counters that an "internal-revenue tax" is a tax collected by the Internal Revenue Service ("IRS") or imposed under the Internal Revenue Code.[1]

The district court agreed with Wyodak, relying entirely on a Sixth Circuit opinion, Horizon Coal Corp. v. United States, 43 F.3d 234 (6th Cir. 1994). In Horizon Coal, the court concluded that 28 U.S.C. § 1346 provided for district court jurisdiction over a reclamation-fee dispute because "internal-revenue tax" means "revenue generated within the boundaries of the United States, as opposed to 'external' revenue." Horizon Coal, 43 F.3d at 239. The government argued that adopting the broader definition of "internal-revenue tax" would require Horizon Coal to exhaust administrative remedies with the Secretary of the Treasury pursuant to 26 U.S.C. § 7422(a), which also uses the phrase "internal revenue tax." But the Sixth Circuit held that the phrase "internal-revenue tax" had a different meaning when used in 26 U.S.C. § 7422. Although the phrase applied to all taxes on internal revenue under 28 U.S.C. § 1346, the court determined that the phrase applied only to taxes collected by the IRS when used in 26 U.S.C. § 7422. Horizon Coal, 43 F.3d at 239-40. The district court adopted this reasoning without further explanation.

**B**

We review the district court's jurisdictional ruling de novo. Huerta v. Gonzales, 443 F.3d 753, 755 (10th Cir. 2006). The same is true of the district court's statutory interpretation. United States v. DeGasso, 369 F.3d 1139, 1144 (10th Cir. 2004).

---

[1] The government does not argue the reclamation fee is not a tax.

At the outset, we must state our disagreement with the district court's reliance on Horizon Coal. A core tenet of statutory construction is that "identical words used in different parts of the same act are intended to have the same meaning." Dep't of Revenue v. ACF Indus., 510 U.S. 332, 342 (1994) (quotation omitted). Both 26 U.S.C. § 7422 and 28 U.S.C. § 1346 use the phrase "internal revenue tax" (or in the latter case "internal-revenue tax"), and in both instances, the language was added by the Revenue Act of 1921, Pub. L. No. 67-98, 42 Stat. 227. See tit. XIII, § 1318, 42 Stat. at 315 (predecessor of 26 U.S.C. § 7422); tit. XIII, § 1310(c), 42 Stat. at 311 (predecessor of 28 U.S.C. § 1346). Absent some very good reason to conclude that Congress intended the phrase "internal-revenue tax" to have two different meanings within the very same act, such a tortured interpretation should be avoided. Neither the Sixth Circuit nor Wyodak has provided such a reason. We conclude that the phrase "internal-revenue tax" must mean the same thing in 28 U.S.C. § 1346 as it does in 26 U.S.C. § 7422.

This, of course, requires that we decide which of the competing interpretations reflects Congress' intent. In doing so, we start with the text of the statute. See United States v. Cisneros-Cabrera, 110 F.3d 746, 747 (10th Cir. 1997). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Peters v. Wise (In re Wise), 346 F.3d 1239, 1241 (10th Cir. 2003) (quotation omitted); see also King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991) ("Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does

- 7 -

the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used . . . ." (quotation omitted)).

We are also mindful that 28 U.S.C. § 1346 implicates special rules of construction because it waives the United States' immunity. In determining the extent to which a statute waives sovereign immunity, waiver must not be enlarged beyond the scope of the statutory language, and all ambiguities in the statute must be construed in favor of immunity. United States v. Williams, 514 U.S. 527, 531 (1995), superseded by statute on other grounds, as stated in Wagner v. United States, 545 F.3d 298, 303 (5th Cir. 2008).

**C**

As is often the case, the statutory text standing alone does not clearly favor one interpretation over the other. Wyodak claims that "internal revenue" simply refers to any revenue generated within the United States. The government contends that "internal revenue" refers to moneys collected by the IRS, or its precursor, the Bureau of Internal Revenue. Both readings are at least plausible constructions of the bare text. Cf. S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement, 620 F.3d 1227, 1238 (10th Cir. 2010).

But in construing § 1346(a)(1), we are not constrained to consider the three-word phrase in isolation; we must also consider the context in which the statute was drafted. See Wise, 346 F.3d at 1241. In 1954, the year in which the statute assumed its current form, see Act of July 30, 1954, Pub. L. No. 83-559, 68 Stat. 589, taxpayers who believed they had paid illegally-exacted taxes had three options for seeking recovery, see William

T. Plumb, Jr., Tax Refund Suits Against Collectors of Internal Revenue, 60 Harv. L. Rev. 685, 686-87 (1947).  First, they could sue the United States in the Court of Claims (now the Court of Federal Claims), 28 U.S.C. § 1491 (1952) (superseded).  Second, they could bring suit "against the tax collector personally rather than against the United States."  See Williams, 514 U.S. at 532 (citation omitted).[2]  Or, third, they could invoke the old version of § 1346(a)(1), which was identical to the current version, but with two extra conditions:  a district court only had jurisdiction "(i) if the claim does not exceed $10,000 or (ii) even if the claim exceeds $10,000 if the collector of internal revenue by whom such tax, penalty or sum was collected is dead or is not in office as collector of internal

---

[2] The right to sue the collector personally was a longstanding creature of common law.  Sirian Lamp Co. v. Manning, 123 F.2d 776, 778 (3d Cir. 1941), overruled on other grounds by Flora v. United States, 362 U.S. 145, 147 n.1 (1960).  Although taxpayers could always sue a tax collector in state court, Congress also granted federal district courts jurisdiction over such claims in the Force Act (also known as the Bloody Bill) of 1833.  See Force Act of 1833, ch. 57, § 2, 4 Stat. 632, 632-33 (1833); see also City of Phila. v. Collector, 72 U.S. (5 Wall.) 720, 728 (1867).  Because such actions were technically personal suits, sovereign immunity was not implicated.  See Smietanka v. Ind. Steel Co., 257 U.S. 1, 4 (1921).

Commentators called "[t]he suit against the collector for a refund . . . a most anomalous action," Plumb, supra, at 687, because the collector was deemed personally liable for erroneously collected taxes, see United States v. Kales, 314 U.S. 186, 199 (1941), but any recovery against him was paid by the Treasury, 28 U.S.C. § 842 (1940) (superseded).  The personal suit was abolished with the enactment of 26 U.S.C. § 7422, which provides that tax refund suits "may be maintained only against the United States and not against any officer or employee of the United States."  Id.; see also Mikulski v. Centerior Energy Corp., 501 F.3d 555, 564 (6th Cir. 2007) ("[Section 7422] was intended to provide taxpayers with a means to obtain relief from improper collections by tax collectors while also protecting government collection officers from being sued by taxpayers."); cf. Brennan v. Sw. Airlines Co., 134 F.3d 1405, 1411 (9th Cir. 1998).

revenue when such action is commenced . . . ." 28 U.S.C. § 1346(a)(1) (Supp. V 1952) (superseded).

In other words, at the time the current version of § 1346(a)(1) was amended, its jurisdictional grant was limited and interstitial, intended to give taxpayers a remedy when the other two options (suing in the Court of Claims or suing the collector personally) were inadequate. The rationale for the $10,000 limitation was "the feeling that taxpayers wealthy enough to be assessed taxes in excess of $10,000" could afford to exercise option one and sue in the Court of Claims, but that others, subject to lower taxes, "could not afford to pursue an action in Washington." H.R. Rep. No. 83-659, at 2 (1953). Likewise, the second exception allowed direct suits against the United States in situations where the collector could not be sued personally.

Another contextual consideration warrants our attention. In 1952, President Truman issued Reorganization Plan No. 1, which drastically changed the structure of internal revenue collection in the United States. See Bryan T. Camp, Theory and Practice in Tax Administration, 29 Va. Tax Rev. 227, 241 (2009). Since 1862, income taxes had been collected by presidentially-appointed assessors and collectors who were effectively sovereign within their geographic jurisdictions. Id. But after a House Ways and Means Committee inquiry revealed widespread corruption in this system, investigators concluded that the "collectors could not be effectively supervised by the Commissioner [of Internal Revenue], or even by Treasury, because of their political connections." Id. at 241-42. President Truman's Plan sought to replace the collectors with district

commissioners, who were career civil service employees rather than political appointees. See Reorganization Plan No. 1 of 1952, H.R. Doc. No. 82-327, at 3 (1952). Congress quickly approved the Plan, and over the next two years, the Bureau of Internal Revenue became the IRS, with tax administration being divided among nine geographic regions (headed by regional directors) and sixty-four districts (headed by district directors). Camp, supra, at 242-43. "District directors now held all the old powers of the assessor and collector combined." Id. at 242.

Having explained its context, we proceed to interpreting the statute itself. The present version of § 1346(a)(1) was created mid-1954, when the eighty-third Congress passed S. 252, 83d Cong. (1st sess. 1954), creating Pub. L. No. 83-559, 68 Stat. 589. Sponsored by Georgia Senator Walter George, S. 252 was introduced as a "very simple bill" with two modest goals: "to preserve the right of trial by jury to a [taxpayer claiming a refund] and to permit [him] to bring his suit in the district court in the district in which he lives." Civil Actions in District Courts to Recover Taxes: Hearing Before the Subcomm. on Improvements in Judicial Machinery of the S. Comm. on the Judiciary, 83d Cong. 2. (1953) [hereinafter S. 252 Hearings] (statement of Sen. George).

Congress had the recent reorganization of the nation's internal revenue collection in mind when it considered S. 252. Senator George stated that the bill was necessary because "the reorganization of the Bureau of Internal Revenue created some doubt in the minds of a great many lawyers whether the right of action [against the collector] would survive." S. 252 Hearings at 2 (statement of Sen. George). Senator George confirmed

that the "right of action did survive . . . against the chief collector within [a] State." Id.

What had been an action against the collector under the common law could now be brought either as a personal suit against an IRS director, or as a suit against the United States under § 1346(a)(1). However, because at the time S. 252 was passed the usual taxpayer suit was a personal action against the collector, such an action had to be brought in the judicial district in which the collector resided. See S. 252 Hearings at 3 (statement of Elbert Tuttle, Treasury Department general counsel). Consequently, taxpayers who lived in the collector's judicial district had an advantage over those residing elsewhere. Id. Congress sought to expand this benefit to all taxpayers. See id. at 2.

The only change S. 252 made to § 1346(a)(1) was to excise the two conditions for district court jurisdiction (the $10,000 limit or the death of the tax collector), thereby allowing all "internal-revenue tax" refund suits to be brought in district court. In effect, S. 252 recognized that personal suits against the tax collector were a legal fiction, and allowed those suits to be heard in their true form—as "a suit against the United States." S. 252 Hearings at 4 (statement of Mr. Tuttle). By converting tax actions from personal suits against the collector into suits against the United States, S. 252 allowed the actions to be brought in a taxpayer's home district.

As S. 252's limited purpose suggests, the bill was not intended to drastically alter the type of claims that could be brought in federal courts. Rather, the bill merely changed where those claims could be brought. After Pub. L. No. 83-559 was enacted, taxpayers could file tax refund suits in their home districts, rather than being limited to the Court of

- 12 -

Claims or the tax collector's home district.  But Pub. L. No. 83-559 was not intended to provide "new substantive rights to the taxpayers; it simply makes it easier for them . . . to sue in the jurisdiction in which they reside."  S. 252 Hearings at 4 (statement of J.G. Sourwine, subcommittee counsel).

As this legislative history clarifies, S. 252 did not create any substantive rights that did not exist before its enactment.  Accordingly, the "substantive rights" granted by § 1346(a)(1), as amended by Pub. L. No. 83-559, go no further than the rights that existed at common law against the tax collector.  Moreover, the legislative history confirms that the only "substantive right[]," S. 252 Hearings at 4, granted by § 1346(a)(1)—both before and after its amendment—is the right to sue for a refund of taxes collected by the IRS or the Bureau of Internal Revenue.

Reporting on S. 252, the House Committee on the Judiciary lists a personal suit against the tax collector as one of the four ways "a Federal taxpayer who feels aggrieved by a deficiency assessment against him may contest the Bureau of Internal Revenue's determination of a tax."  H.R. Rep. No. 83-659, at 1 (1953) (emphasis added).  The conference committee explained that S. 252 abolished "[t]he fiction that the [tax refund] action is against an individual (i.e., the director or former director or former collector of Internal Revenue)."  H.R. Rep. No. 83-2276, at 2 (1954) (emphasis added).  And the Senate subcommittee report explains that the bill was proposed in response to the reorganization of the Bureau of Internal Revenue, S. 252 Hearings at 2, and that the only purpose of S. 252 is "to give the taxpayers throughout the country the same right that

- 13 -

those taxpayers" who live in the same district as their Bureau of Internal Revenue tax collector already possessed, S. 252 Hearings at 4, i.e., the right to bring a suit for recovery of taxes that the Bureau of Internal Revenue illegally collected.

We are persuaded by this legislative history that, for purposes of district court jurisdiction under 28 U.S.C. § 1346(a)(1), Congress intended the phrase "internal-revenue tax" to mean taxes collected by the IRS. Suits for recovery of other fees and taxes, even if they can be characterized as "internal revenue," do not fall within the statute's ambit.

Although we announce this rule for the first time, we note that our interpretation best harmonizes existing case law on § 1346(a)(1) and its interaction with related statutes. First, by providing a uniform interpretation of the phrase "internal revenue" as between § 1346 and 26 U.S.C. § 7422, those statutes seamlessly interlock in the manner intended by Congress. By using the same definition in both statutes, the provisions work together to require that all tax refund claimants seeking relief in district court must first exhaust their administrative remedies with the Secretary of the Treasury. The contrary construction adopted in Horizon Coal and by the district court below would create a class of claims over which district courts possessed jurisdiction regardless of exhaustion. See 42 F.3d at 239-40.

Further, our reading is consistent with case law from other jurisdictions interpreting § 1346(a)(1)—with the exception of the aforementioned Sixth Circuit analysis. The Internal Revenue Code provides that "[t]he Secretary [of the Treasury]

shall collect the taxes imposed by the internal revenue laws." 26 U.S.C. § 6301. We are unable to find any case in which a district court refused § 1346(a)(1) jurisdiction over a tax assessed under the Internal Revenue Code (and therefore within the IRS' collection authority). See, e.g., Pittston Co. v. United States, 199 F.3d 694, 701-02 (4th Cir. 1999) (Coal Act premiums, 26 U.S.C. § 9701); Kaucky v. Sw. Airlines Co., 109 F.3d 349, 350 (7th Cir. 1997) (airline excise tax, 26 U.S.C. § 4261); Rue R. Elston Co. v. United States, 532 F.2d 1176, 1177 (8th Cir. 1976) (manufacturer excise tax, 26 U.S.C. § 4061); PNC Bank, N.A. v. United States, No. 2:04CV1576, 2006 WL 1604678, at *1 (W.D. Pa. May 16, 2006) (unpublished) (federal telecommunications excise taxes, 26 U.S.C. § 4251); Kanawha Dredging & Minerals Co. v. United States, No. 2:85-1306, 1987 WL 49371, at *1 (S.D.W. Va. Dec. 1, 1987) (unpublished) (Black Lung excise tax, 26 U.S.C. § 4121). In contrast, district courts have only refused § 1346(a)(1) jurisdiction for procedural reasons, e.g., Flora, 362 U.S. at 146, or because the suit is not for a refund of taxes collectible by the IRS. See, e.g., Murphy v. United States, 45 F.3d 520, 521, 523 (1st Cir. 1995) (claim regarding seizure of real estate); Cleveland Chair Co. v. United States, 526 F.2d 497, 499 (6th Cir. 1975) (action under Uniform Commercial Code); Dresser Indus., Inc. v. United States, 73 F. Supp. 2d 682, 692 (N.D. Tex. 1999) (claim for carry-forward of tax credits); United States v. Raytown Lawnmower Co., 763 F. Supp. 411, 412-13 (W.D. Mo. 1991) (conversion and money received claims); DuPont Glore Forgan Inc. v. Am. Tel. & Tel. Co., 428 F. Supp. 1297, 1307-08 (S.D.N.Y. 1977) (claim defendants tortiously increased tax liability); Film Truck Serv., Inc. v. Nixon, 216 F. Supp. 77, 78

(E.D. Mich. 1963) (property-seizure claim); cf. United States v. Tri-No Enters., Inc., 819 F.2d 154, 159 (7th Cir. 1987) (SMCRA reclamation fees are a form of excise tax, but are not imposed by Subtitle D of the Internal Revenue Code and thus the Code's statute of limitations does not apply).

## III

Unlike the majority opinion, which reads the pertinent statutory language as ambiguous, the concurrence concludes the same language is unambiguous in agreeing with the majority result. The concurrence provides an interesting and educational elaboration of the history of the phrase "internal-revenue law," but the majority declines to incorporate the concurrence into its decision because it is well-established that, if an act is unambiguous, that ends the matter and resort should not be had to the statutory history. See United States v. Romero, 122 F.3d 1334, 1337 (10th Cir. 1997).

## IV

Wyodak does not argue that the SMCRA reclamation fee is collected by the IRS. Instead, it acknowledges that the fee is collected by OSM. Under the rule we announce today, that ends the inquiry. 28 U.S.C. § 1346(a)(1) did not give the district court jurisdiction over Wyodak's claim, and Wyodak has not established an alternative basis for district court jurisdiction. It must bring this claim in the Court of Federal Claims.

We **VACATE** the district court's judgment and **REMAND** with orders to **DISMISS** for lack of subject matter jurisdiction.

09-8097, *Wyodak Resources Dev. Corp. v. United States*

**GORSUCH, J**., concurring.

I write separately because, to my mind, the plain language of 28 U.S.C. § 1346(a)(1) compels our decision to reverse. Section 1346(a)(1) gives district courts the power to hear:

> [a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws.

Accordingly, there are only two ways the district court could've lawfully asserted jurisdiction under § 1346(a)(1) to entertain Wyodak's refund claim: if SMCRA qualifies as an "internal-revenue law" or if SMCRA's reclamation fee constitutes an "internal-revenue tax."[1] As it happens, neither of these conditions holds true, and so I agree with my colleagues that the Court of Claims, not the district court, is the appropriate forum for resolving this dispute.

To explain why this is so, I begin by examining what the terms "internal-revenue tax" and "internal-revenue law" do and do not encompass as a matter of

---

[1] Arguably, "any penalty claimed to have been collected without authority" creates an additional route to jurisdiction, one that does not require a relationship to either "internal-revenue taxes" or "internal-revenue laws." Even assuming as much, however, does not change the result, because at no point in this litigation has Wyodak asserted that the reclamation fee is a penalty collected without authority.

their plain meaning. I then turn to assess whether SMCRA's reclamation fee falls within either.

I

Beginning with the phrase "internal-revenue law," it turns out that each of those words had a specific and nuanced meaning when Congress wrote them into § 1346(a)(1)'s predecessor, the Revenue Act of 1921. *See Flora v. United States*, 357 U.S. 63, 65, 70 (1958) (noting that interpretation of § 1346 turns on the meaning of these terms in 1921). Then (like now), there was substantial disagreement about the distinction between constitutionally permissible taxes on internal activity (allowed by Article I, § 8) and constitutionally impermissible taxes on exports (enjoined by Article I, § 9). *See, e.g., United States v. Hvoslef*, 237 U.S. 1, 13 (1915); *Thames & Mersey Marine Ins. Co. v. United States*, 237 U.S. 19, 25 (1915); *A.G. Spalding & Bros. v. Edwards*, 262 U.S. 66 (1923); *United States v. Int'l Bus. Machs. Co.*, 517 U.S. 843, 846-49 (1996). And then (like now), there was a brewing dispute over the role of Congress's taxing power, particularly whether certain congressional actions taking the guise of taxes were actually regulations aimed at controlling private behavior — and, if so, whether those actions exceeded Congress's regulatory authority. *See, e.g., Pace v. Burgess*, 92 U.S. 372, 376 (1875); *Helwig v. United States*, 188 U.S. 605, 610-11 (1903); *Lipke v. Lederer*, 259 U.S. 557, 561-62 (1922); *Hill v. Wallace*, 259 U.S.

-2-

44, 67-69 (1922); *Florida ex rel. McCollum v. U.S. Dep't of Health and Human Svcs.*, 716 F. Supp. 2d 1120, 1130 (N.D. Fla. 2010).

The distinctions along these two axes — between internal and external taxes, on the one hand, and between revenue-raising taxes and regulatory fees, on the other — often bore great consequence. Because of the constitutional constraints on Congress's regulatory power, hard-won social legislation often could survive constitutional review only if it could convincingly invoke Congress's taxing authority. *See, e.g., Child Labor Tax Case*, 259 U.S. 20, 37-38 (1922) (penalty for employing child labor was not a tax). At the same time, *avoiding* the "tax" category could be critical for complying with the Export Clause. *See, e.g., Pace*, 92 U.S. at 375-76 (tobacco stamp fee not an unconstitutional tax on exports). Congress was surely aware of these contemporaneous contests over the scope of its taxing and regulatory powers. And by choosing the term "*internal*-revenue *tax*," the Legislature sought to pick a side in and play off of both distinctions: internal as opposed to external; tax as opposed to fee. Here, of course, there's no question that SMCRA applies internally. But much hinges on whether SMCRA is properly understood as levying a tax or imposing a regulatory fee.

At the time Congress invoked this tax-fee distinction to limit the jurisdiction of the district courts in § 1346(a)(1)'s predecessor statute, the difference between a tax and a fee turned largely on legislative purpose. If a

-3-

law's purpose was to regulate private behavior, the costs imposed by it were treated as fees — and so required justification under the legislature's *regulatory* authority. *See* 1 Thomas M. Cooley, *The Law of Taxation* § 27 (4th ed. 1924) ("Duties, excises and license laws, having for their object the common benefit and protection, and designed for the prevention or mitigation of evils, are not acts of taxing power."); *Hill v. Kemp*, 478 F.3d 1236, 1244 (10th Cir. 2007) (noting distinction between tax and fee turned on purpose of the assessment and the use to which the proceeds were put); *see*, *e.g.*, *Rhinehart v. State*, 117 S.W. 508, 512-13 (Tenn. 1908) (holding fee on insurance contracts to create fund for investigating fires was not a tax). Meanwhile, a charge imposed for the purpose of raising general revenue was a tax, and so needed to be consistent with the sovereign's authorized *taxing* powers. *See* Cooley, *supra*, § 27 ("If revenue is the primary purpose, the imposition is a tax."); *State ex rel. Wyatt v. Ashbrook*, 55 S.W. 627, 629 (Mo. 1900) (department-store license fee was a tax because it bore no relation to the preservation of the public health, morals, safety, or welfare); *Village of Lemont v. Jenks*, 64 N.E. 362, 364 (Ill. 1902) (surcharge on public water supply was a tax because it was imposed for the purpose of raising revenue). The legislature's choice of the word "tax" or "fee" *might* be indicative of a bill's purpose, but courts were willing to — and often did — look beyond the title of the act to discern the legislature's intentions. *See* Cooley, *supra*, § 37; *Child Labor Tax Case*, 259 U.S. at 39; *Wyatt*, 55 S.W. at 629.

The phrase "internal-revenue law" also carried a well-established meaning in 1921. In fact, the term "revenue law" had long been used to circumscribe the jurisdiction of federal courts. For example, Congress used the expression "revenue law" back in 1844 when it sought to expand the Supreme Court's jurisdiction over tax appeals. Beginning in that year, the Supreme Court could hear certain appeals without regard to the amount in dispute, but only when it came to civil actions "for the enforcement of the revenue laws of the United States." Act of May 31, 1844, 5 Stat. 658; *United States v. Hill*, 123 U.S. 681, 684-85 (1887). And, even farther back, Congress had granted circuit courts removal jurisdiction over suits against officers of the United States, but only if the officer's disputed conduct was under the color of "the revenue laws." *See* Act of Mar. 2, 1833, ch. 57, § 3, 4 Stat. 633; *Cleveland, C., C. & I.R. Co. v. McClung*, 119 U.S. 454, 460-61 (1886).

Given this history, it shouldn't come as a surprise that federal courts had the chance to define the term "revenue law" by 1921. As it turns out, the Supreme Court had done so unequivocally and more than thirty years earlier:

> [T]he term "revenue law," when used in connection with the jurisdiction of the courts of the United States, means a law imposing duties on imports or tonnage, or a law providing in terms for revenue; that is to say, a law which is directly traceable to the power granted to congress by section 8, art. 1, of the constitution, "to lay and collect taxes, duties, imposts, and excises."

*Hill*, 123 U.S. at 686 (1887); *see also United States v. Mayo*, 26 F. Cas. 1230, 1231 (C.C. Mass. 1813) (Story, J.) (defining revenue laws as "such laws as are

made for the direct and avowed purpose for creating and securing revenue or public funds for the service of the government").

Given this definition, the relationship between the two prongs of § 1346(a)(1) turns out to be quite straightforward:  an *internal-revenue law* is a law that enacts an *internal-revenue tax*.  *See* Cooley, *supra*, § 12 ("Any law which provides for the assessment and collection of a tax to defray the expenses of government is a revenue law.") (internal quotation marks omitted).  So, the present question of jurisdiction under § 1346(a)(1) turns out to be a relatively simple one:  We need only determine whether the law at issue was enacted pursuant to Congress's power to tax or its power to regulate.

II

With this understanding of § 1346(a)(1)'s plain language in mind, it becomes quickly evident that Congress was exercising its *regulatory* authority when it passed SMCRA.  The first clue comes from the declarations found in SMCRA itself.  The statute's announced purpose is "to provide for cooperation between the Secretary of the Interior and the States with respect to the regulation of surface coal mining operations, and the acquisition and reclamation of abandoned mines, and for other purposes."  Pub. L. No. 95-87, 91 Stat. 445 (1977).  These "other purposes" turn out to be many but exactly none involves the raising of revenue.  *See* 30 U.S.C. § 1202.  What's more, Congress went to great lengths to note the effects of surface mining on interstate commerce, *see* 30

-6-

U.S.C. § 1201, and even limited certain provisions so that SMCRA would not exceed Congress's authority to regulate interstate commerce, *see* 30 U.S.C. § 1291(3) & (28)(A) — none of which would have been necessary, of course, if Congress had simply wanted to pass a tax. And, if that weren't a clear enough indication of the Legislature's idea, Congress used the term "fee" consistently and throughout SMCRA. Emphatic in its silence, SMCRA contains not a single reference to any federal *tax*.

Neither does this appear to have been a failure of vocabulary. To the contrary, SMCRA stands in stark and telling contrast with another bill the same Congress passed just six months later, the "Black Lung Benefits Revenue Act of 1977," Pub. L. No. 95-227, 92 Stat. 11, *codified at* 26 U.S.C. § 4121 et seq. The purpose of that Act, Congress proclaimed, was to "impose an excise tax on the sale of coal." *Id.* And it gets right to the point in doing so: "There is hereby imposed . . . a tax." *Id.* at §2(a). The name of the act, its declared purpose, and its unequivocal use of the word "tax" leave little of Congress's intent to question. When it came to invoking its taxing power to raise revenue from mining operations, Congress generally, and the 95th Congress in particular, plainly knew how to do so.

Looking beyond form to substance only confirms that SMCRA is an act of regulation, not taxation. SMCRA's objective is plainly to "protect the environment" by "assur[ing] that adequate procedures are undertaken to reclaim"

surface mines. *See* 30 U.S.C. § 1202(d), (e). In service of this goal, SMCRA imposes a fee on coal mining and commands that the resulting funds be used to reduce and repair the damage caused by mining activities. *See* 30 U.S.C. § 1232(g). Some portion of the collected fees goes towards remedying past harms — principally reclaiming surface mines abandoned prior to 1977. *See* §§ 1232(g)(1), 1232(g)(3)(C), 1233(a)(1), and 1234. The balance of the collected fees goes to avoiding *new* mining-related harms — funding emergency reclamation projects, *see* §§ 1232(g)(3)(B) & 1240, subsidizing the costs of complying with the regulation incurred by certain small-scale producers, *see* §§ 1232(g)(3)(A) & 1257(c), and offsetting the expense of administering SMCRA itself, *see* § 1232(g)(3)(D). But for all SMCRA does, providing for the general revenue it does not. No portion of the assessment goes into the general bourse, or, for that matter, towards any purpose *other than* ameliorating harms caused by the mining industry. *Cf. Hill v. Kemp*, 478 F.3d at 1246 (specialty license plate program was a tax because proceeds went to a wide array of public purposes unrelated to the assessed activity).

Assessments of this sort, imposed on particular groups to offset the public welfare harms their activities cause, were (at least in 1921) well-recognized as an exercise of the sovereign's *regulatory*, not taxing, authority. *See* Cooley, *supra*, § 28 (the police powers include the authority to levy fees on industries due to their "special relation to property . . . or to business peculiarly troublesome or

dangerous"); *People v. Van Horn*, 9 N.W. 246, 247 (Mich. 1881) (dog license fee was not a tax because proceeds were reserved to compensate local sheep owners for dog-related damage). In this case, Congress found that many mining operations cause environmental harms that "adversely affect commerce and the public welfare." *See* 30 U.S.C. § 1201(c). SMCRA merely allocates the cost of remedying those harms to the industry responsible for them — a classic use of regulatory authority to protect the public welfare.

To be sure, for some of the time relevant to this litigation, the Secretary of the Interior was authorized to transfer the *interest* earned on the reclamation fees (and potentially a small amount of the fees themselves) to the United Mine Workers of America Combined Benefit Fund. *See* "Energy Policy Act of 1992," Pub. L. 102-486, § 19143, 106 Stat. 2776, 3056. But even here the Secretary was permitted to do so only for the purpose of funding the pension benefits of retired miners — itself an effort to coordinate settlement of the industry's collective liabilities, not to enhance the general revenue. Besides and what's more, even if Congress had steered a modest portion of excess reclamation fees to other, completely unrelated projects, that would not suffice to make their primary purpose revenue-raising or otherwise convert them into taxes under the accepted meaning of the term in 1921. *See* Cooley, *supra*, § 27 ("If the primary purpose of the legislative body in imposing the charge is to regulate, the charge is not a tax even if it produces revenue for the public."); *Rhinehart*, 117 S.W. at 513 ("The

provision that [] any surplus of the charge . . . shall be paid into the state treasury, does not make that charge a tax for revenue.").[2]

Under the plain meaning of § 1346(a)(1), then, SMCRA isn't a revenue law.  And its reclamation fee isn't a tax.  Accordingly, the district court had no jurisdiction under § 1346(a)(1) to hear Wyodak's lawsuit disputing its SMCRA assessment, and Wyodak's lawsuit should've been heard, if at all, only in the Court of Claims.  For this reason, I join the majority in remanding this case to the district court with instructions to dismiss it.

---

[2] Although the district court stated that "a plethora of decisions" had found SMCRA's coal reclamation fee to be a tax, in fact many of the cases the district court cited do not actually decide whether SMCRA's assessment is a tax or a fee.  For example, *United States v. Tri-No Enters., Inc.* merely held that the reclamation fee was not a "civil fine, penalty, or forfeiture" for the purposes of a statute of limitations.  819 F.2d 154, 158 (7th Cir. 1987).  A penalty, of course, is neither a tax nor a fee — and as such the Seventh Circuit didn't have any reason to consider the question.  In fact, only two of the cases cited by the district court seem to have actually decided whether SMCRA imposes a tax or a fee.  Though they both concluded it was a tax, however, neither did so for purposes of § 1346(a)(1).  *See United States v. River Coal, Co.*, 748 F.2d 1103, 1106-07 (6th Cir. 1984) (reclamation fee not discharged under the repealed Bankruptcy Act of 1976); *Consolidation Coal Co. v. United States*, 64 Fed. Cl. 718, 732 (Fed. Cl. 2005), *reversed and remanded on other grounds*, 528 F.3d 1344 (Fed. Cir. 2008) (reclamation fee a "tax" for purposes of the Export Clause).  What's more, neither discussed the well-recognized principle that a valid regulatory fee could be imposed on dangerous activities to offset the cost of protecting the public from any resulting harms.  But, as the question before us is limited to the scope of § 1346(a)(1), I express no opinion as to whether this common law principle, though certainly forceful in 1921, is relevant to the interpretation of the word "tax" in other contexts.